*In re* MARRIAGE OF DARRIN LANE STOPHER, Petitioner-Appellant, and STACY STOPHER, n/k/a Stacy Hardwick, Respondent-Appellee.

Fourth District   No. 4—01—0804

Argued February 27, 2002.—Opinion filed April 10, 2002.

Greg German (argued), of Tepper, Mann & German, P.C., of Urbana, for appellant.

Valerie McWilliams (argued), of Land of Lincoln Legal Assistance Foundation, Inc., of Champaign, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Petitioner, Darrin Lane Stopher, and respondent, Stacy Stopher, now known as Stacy Hardwick, were married in 1998. Stacy is developmentally disabled and functions at the level of an eight-year-old child. The parties have one minor child, Bradley. The Champaign County circuit court dissolved the parties' marriage in May 2000, granted temporary custody of the child to Stacy, and reserved the other issues, including permanent custody. In August 2001, the trial court granted permanent custody to Stacy. Darrin appeals, arguing the trial court's decision to grant permanent custody of the child to Stacy was an abuse of discretion. We affirm.

## I. BACKGROUND

The parties met in February 1997 and began dating. Stacy Hardwick was then 20 years old. Her intelligence quotient (I.Q.) is 67, which places her in the tenth percentile in terms of overall cognitive and intellectual functioning. She reads at a second-grade level and is able to do arithmetic at a fourth-grade level. Perceptual skills are her strongest area of intellectual skill. Despite her limitations, Stacy is able to drive a car and hold a janitorial job. Darrin Stopher is nine years Stacy's senior and of above-average intelligence.

Stacy gave birth to a son, Bradley Clark Stopher, on February 17, 1998. The parties were married on June 1, 1998. After Bradley's birth and prior to the parties' marriage, the parties lived apart from each other. Stacy and Bradley lived with Stacy's mother, Nadine Hardwick, who helped Stacy care for the baby. After the parties married, Darrin moved in with Stacy, Bradley, and Nadine.

During the parties' marriage, Stacy was the primary caregiver for Bradley. Although both Stacy and Darrin worked outside the home, Darrin worked long hours and unpredictable shifts as a security guard.

Due to Stacy's disability, she cared for her son with intervention

from several public agencies. In view of concern over her cognitive limitations, hospital personnel notified the Illinois Department of Children and Family Services (DCFS) when Bradley was born. Richard Schmidt, the child-welfare specialist at DCFS who oversaw Stacy's case, referred her to the Children's Foundation, which provided Stacy with a home interventionist to teach her parenting skills and to act as an "advocate" for Stacy, driving her to medical appointments and making sure she had everything she needed for herself and the baby. In addition, due to her low income, Stacy qualified for the Women, Infants, and Children nutrition program (WIC). Services provided to her through the WIC program included nutritional counseling, family case management, food vouchers, and immunizations for Bradley. The family case-management component consisted of education in parenting skills. Significantly, Jami Schenkel and Tami Leigh, who provided parenting education to Stacy through WIC and the Children's Foundation, respectively, each testified that Stacy was able to learn and retain all the parenting skills they taught her.

Stacy has had substantial support in caring for her son from her mother and three older sisters. When Bradley was born, her mother, at the request of DCFS, moved into the trailer Stacy had lived in alone prior to that time. (Although she moved out of the trailer in May 2000, she continued to see Bradley and Stacy on a daily basis and has since moved back in with Stacy and Bradley.)

The parties separated in June 1999. Bradley continued to live with Stacy, who cared for him with assistance from her mother, sisters, and caseworkers. Darrin filed a petition for dissolution in August 1999, which the trial court granted at a May 2, 2000, hearing. On August 4, 2000, the trial court entered a written dissolution judgment. The trial court granted temporary custody of Bradley to Stacy and reserved issues of permanent custody, child support, and property division.

In December 2000, the trial court granted Darrin's motion for a custody evaluation pursuant to section 604.5(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/604.5(a) (West 2000)). Dr. Elizabeth Scott, a marriage and family therapist appointed by the court, interviewed both parties and observed their interactions with Bradley in their respective homes. She also referred the parties to a clinical psychologist for psychological testing. On the basis of these tests and observations, Dr. Scott concluded that Stacy has no emotional problems. Darrin, on the other hand, has perfectionist compulsive tendencies and has deep feelings of resentment due to abandonment by both his biological and adoptive fathers when he was a child. Dr. Scott noted that both parties share a close bond with Bradley and that both spend a lot of time interacting with him. She

described Stacy as "a warm, loving[,] and attentive parent to Bradley with the capacity to respond to his needs in a relaxed, easygoing manner." She noted that while Darrin is aware of Bradley's likes and dislikes and devotes a great deal of time to one-on-one interaction with the child, he has a tendency to project his own personality onto Bradley. Further, he has a tendency to overstimulate Bradley. For example, he placed enough snacks on Bradley's play table to feed 20 children.

In her report, Dr. Scott addressed Stacy's ability to adequately care for Bradley, including her ability to keep him safe from harm, her ability to see that he is well-nourished, and her ability to help him in his intellectual development as he grows. Dr. Scott stated that Stacy is keenly aware of potential dangers to a small child and acts appropriately to protect Bradley from any such dangers even though she does not always understand why something is dangerous to him. She expressed some concern, however, about Stacy's ability to protect Bradley from harm if confronted with an unfamiliar situation. Dr. Scott noted that Darrin and his family had expressed concern over Bradley's nutrition due to the fact that both his height and weight fell below the fifth percentile for his age, but she stated that his pediatrician and nurse-caseworker from WIC both attributed this to genetics rather than malnutrition. She predicted that, due to Stacy's cognitive limitations, she would be unable to meet Bradley's developmental needs as he grew older. Emphasizing this last factor, she recommended that Darrin be given full legal custody of Bradley.

On June 14, 2001, and July 10, 2001, the trial court heard extensive testimony regarding permanent custody and the other reserved issues. Much of the testimony centered on Stacy's ability to adequately care for Bradley. On August 23, 2001, the trial court entered its final order. After considering all relevant statutory factors (see 750 ILCS 5/602 (West 2000)), the trial court found that it was in Bradley's best interests to remain in the custody of his mother, Stacy Hardwick. The order did not contain specific findings as to the impact of Stacy's disability on her ability to care for the child. This appeal followed.

## II. ANALYSIS

Darrin contends the trial court's finding that the award of custody to Stacy was against the manifest weight of the evidence because (1) the finding contravenes the recommendation of the custody evaluator, and (2) Stacy's developmental disability renders her incapable of providing a safe environment for Bradley. We disagree.

■ The trial court must determine custody according to the best

interest of the child. 750 ILCS 5/602(a) (West 2000). The trial court's findings as to the child's best interest are entitled to great deference because the trial judge is in a better position than are we to observe the temperaments and personalities of the parties and assess the credibility of witnesses. *In re Marriage of Felson*, 171 Ill. App. 3d 923, 926, 525 N.E.2d 1103, 1105 (1988). A reviewing court will not overturn a trial court's custody determination unless it is against the manifest weight of the evidence, is manifestly unjust, or results from a clear abuse of discretion. *Stockton v. Oldenburg*, 305 Ill. App. 3d 897, 906, 713 N.E.2d 259, 266 (1999); *Felson*, 171 Ill. App. 3d at 926-27, 525 N.E.2d at 1105.

■ Darrin argues that the trial court's determination that awarding primary custody to Stacy was in Bradley's best interest was against the manifest weight of the evidence because the custody evaluator recommended that he be given custody of the child. However, the trial court, not the custody evaluator, determines the child's best interest. The court need not accept the recommendation of an expert. *Stockton*, 305 Ill. App. 3d at 906, 713 N.E.2d at 266; see also *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106 ("[a] recommendation concerning the custody of a child is only that, a recommendation"); 750 ILCS 5/605(c) (West 2000) ("[t]he court *may* examine and consider the investigator's report in determining custody" (emphasis added)).

In *Felson*, 171 Ill. App. 3d at 926, 525 N.E.2d at 1105, the trial court found it would be in the child's best interest to award custody to the mother. Among the evidence the trial court had before it in making this determination was a custody evaluation report. That report recommended the parents share custody of the child. *Felson*, 171 Ill. App. 3d at 927, 525 N.E.2d at 1105. In affirming the trial court's decision not to follow the evaluators' recommendation, the First District Appellate Court stated, "a trial court is free to evaluate the evidence presented and accept or reject it in whole or in part." *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106. The trial court in that case had before it not only the conclusions of the custody evaluators, but also their entire report as well as other evidence. The report indicated that both parents were competent to care for their child but that the father had more help from his extended family than the mother. *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106. Other evidence indicated that part of the father's motive in seeking custody was his desire to please his extended family. *Felson*, 171 Ill. App. 3d at 926, 525 N.E.2d at 1105. Viewing the record as a whole, the First District concluded that the evidence supported the trial court's finding. *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106.

■ Similarly, in the case at bar, the record contains extensive evi-

dence, including observations in the custody evaluator's report, to support the trial court's conclusion, even though its conclusion was not the same as that reached by the custody evaluator. Dr. Scott raised two main concerns in her report: Stacy's ability to respond to an emergency situation and her ability to assist Bradley in his intellectual development as he grows older. A reading of the entire record supports the conclusion that Stacy can adequately protect her child from harm and, with the support she has from her family, can help him to develop intellectually.

Dr. Scott stated in her report that both Darrin and Stacy read to Bradley every day when he is in their care. However, because Stacy reads at a second-grade level and performs other cognitive functions at only a slightly higher level, Bradley will surpass her skill level at a fairly young age. However, Stacy's mother and sisters, who do not suffer from developmental delays, are also deeply involved in his life and will be available to help him in his cognitive development.

Further, the record contains evidence from which the trial court could conclude that Darrin might be less able than Stacy to meet his son's developmental needs due to his compulsiveness and impatience. Dr. Scott stated in her report that Darrin "is a highly intelligent man who has many intellectual interests to share with his son as he matures[;] however, he has some personality characteristics which can either spark Bradley's interests and curiosities[ ] or can shut Bradley down due to overstimulation." For example, Darrin demonstrated his impatience in a letter he wrote to Stacy October 1999, regarding a dispute over a credit card bill he received because Stacy had not given the credit card company a change of address. He wrote, "[y]ou've bumbled around and screwed up my life for the last time," and threatened to take all her household possessions and send them to his family in Missouri.

Dr. Scott and Darrin both described Stacy as protective of Bradley. However, Dr. Scott expressed concern in her report with Stacy's ability to protect Bradley from harm in unfamiliar circumstances. The record, nonetheless, supports the trial court's apparent conclusion that Stacy is able to protect her child and respond to emergencies as they arise. At the hearing, Stacy testified as follows:

"Q. What would you do if Bradley would fall off a swing set and break his arm?

A. I would go see what's wrong with him real quick, call paramedics ***.

Q. Okay. What would you do if he touched a hot pan and got burned?

A. Get cold, get some—put some ice in a bag and put a towel

around it, and put it on his arm or wherever it's burned, and call the paramedics.

Q. What would you do if he stopped breathing?

A. Call the paramedics.

Q. Okay. What would you do if he took some poison?

A. You read the bottle and see what to do.

\* \* \*

Q. And do you have something to give him in your house in case he swallows poison?

A. Yes, I do."

Although she could not pronounce the name of ipecac syrup, she knew she had it in her medicine cabinet in a safety kit.

Although Stacy knew to call 9-1-1 for the paramedics in any emergency she could not handle on her own, she was unable to connect to an operator when she attempted to do so when Bradley stopped breathing. Instead, she called her mother, who helped her to get Bradley the emergency care he needed.

Additionally, a DCFS risk-assessment report dated February 9, 1999, indicated that the child-welfare specialist who worked with Stacy found no risk to Bradley's safety while in her care. The form specifically included a question which directly asked whether the caregiver's developmental disability impaired her ability to supervise and care for the child. The specialist responded, "no." We find the evidence supports the trial court's apparent conclusion that Bradley is safe in Stacy's care.

Darrin next contends that Stacy's disability renders her incapable of providing adequate care to Bradley, and, therefore, the finding that awarding Stacy custody is in Bradley's best interest is against the manifest weight of the evidence. He cites *Corcoran v. Corcoran*, 79 Ill. App. 2d 328, 224 N.E.2d 611 (1967), in support of his position that a parent's mental disability justifies a trial court's award of custody to the other parent. We do not read *Corcoran* to require trial courts to award custody to the other parent in all cases where a parent suffers from a developmental disability.

In *Corcoran*, the First District Appellate Court affirmed a trial court's decision to grant custody of the couple's four teenaged children to the father. That decision was based primarily on the mother's mental illness. *Corcoran*, 79 Ill. App. 2d at 333, 224 N.E.2d at 613. Darrin contends the only major difference between this case and *Corcoran* is that "the *Corcoran* trial court made a correct initial ruling." We disagree. In *Corcoran*, the mother suffered from a mental illness for which she was hospitalized on and off from 1958 until 1962. After her release from a psychiatric hospital in July 1962, she lived with her

mother until May 1963, after which time she lived in a nursing home. *Corcoran*, 79 Ill. App. 2d at 330, 224 N.E.2d at 612. She did not return to the marital home to live with her children until the middle of 1965, after she had filed for dissolution. *Corcoran*, 79 Ill. App. 2d at 330, 224 N.E.2d at 612. During this seven-year period, the children remained in their father's care. *Corcoran*, 79 Ill. App. 2d at 334, 224 N.E.2d at 614. Under these circumstances, the First District found the trial court had acted within its discretion in awarding custody to the father "about whom there was no question of ability to provide and care for the children." *Corcoran*, 79 Ill. App. 2d at 333, 224 N.E.2d at 613.

The instant case is distinguishable. First, although the *Corcoran* court did not specify what mental illness afflicted the mother, the illness apparently rendered her enough of a danger to herself or others that she had to be committed to psychiatric hospitals for significant periods of time. At some point, she had been the subject of civil commitment proceedings. *Corcoran*, 79 Ill. App. 2d at 331, 224 N.E.2d at 612 (noting Mrs. Corcoran's civil rights were restored to her in January 1964). In stark contrast, Stacy's developmental disability has never rendered her a danger to herself or others or required institutional care. Further, the father in *Corcoran* had been his children's primary caregiver and *de facto* custodial parent for seven years prior to the couple's dissolution. In the instant case, Stacy, not Darrin, has been Bradley's primary caregiver his entire life, and she has been his custodial parent since the couple separated in June 1999, two years before the court entered the order granting her permanent custody. Moreover, while there was no question of the father's ability to parent his children in *Corcoran*, here, the custody evaluator, Dr. Scott, raised significant concerns about Darrin's parenting ability.

We are aware of no Illinois cases that directly address the precise issue before us, the impact of a parent's developmental disability on a custody determination. However, the Supreme Court of North Dakota recently addressed an analogous situation in *Holtz v. Holtz*, 595 N.W.2d 1 (N.D. 1999). In *Holtz*, the trial court that entered the order dissolving the parties' marriage awarded sole custody of their four-year-old daughter to her developmentally disabled mother. Three years later, the father petitioned for a change in custody. *Holtz*, 595 N.W.2d at 3. The trial court granted the change in custody and the mother appealed. (We note that North Dakota law, like Illinois law, requires a showing of changed circumstances that justify the change in custody as well as a showing that the change is in the child's best interest. *Holtz*, 595 N.W.2d at 6. This issue is not present in the instant case. However, we find the *Holtz* court's discussion of the child's best interest relevant.)

In affirming the trial court's ruling, the supreme court did not state that a developmentally disabled parent is inherently unable to care for her child. Rather, the court found that the specific facts in the record before it supported the trial court's ruling. Specifically, the court noted that the mother was unable to discipline her child properly. The local social services department received complaints of child neglect from people who had witnessed the mother failing to adequately supervise the child, yelling at her, and using "rather harsh discipline techniques." *Holtz*, 595 N.W.2d at 7. Under her care, the child was less mature than other children her age. *Holtz*, 595 N.W.2d at 5. Although a parent aide was provided to help the mother maintain her household, the assistance was going to be terminated because "at some point the child would start to take care of the mother." *Holtz*, 595 N.W.2d at 5. The parent aide tried to teach the mother better parenting skills, but she did not retain any of the skills the aide taught her and, instead, went back to using "her less effective methods of discipline." *Holtz*, 595 N.W.2d at 5. Further, the mother was unable to help the child with her homework. *Holtz*, 595 N.W.2d at 5.

To the contrary, Stacy is a patient and nurturing mother who is willing and able to take full advantage of the support services available to her. Her caseworkers describe her as cooperative and eager to learn better parenting skills and state that she retains the parenting skills they teach her. In addition, Stacy states that she learns how to do things for her child from reading magazines and watching what other parents do. Bradley, unlike the child in *Holtz*, is developing at a level commensurate with his age. Although Stacy, like the mother in *Holtz*, will become unable to help Bradley with his school homework in the future, this one fact is not dispositive. Unlike the mother in *Holtz*, Stacy is willing to rely on the support provided to her by social service agencies and her family to help her meet her growing child's cognitive needs. The other factors that justified the change of custody in *Holtz* are not at issue in the case at bar.

In addition to the concerns raised by Dr. Scott's evaluation, Darrin questions Stacy's ability to understand Bradley's nutritional needs. The parties presented conflicting evidence as to the cause of Bradley's small stature and low weight. Darrin submitted the evidence deposition of Dr. G. Kris Bysani, a pediatrician and professor of pediatrics, who concluded Bradley suffered from failure-to-thrive syndrome due to undernourishment. Stacy, however, submitted the evidence deposition of Bradley's treating pediatrician, Dr. Marcia Hauter, who reached the opposite conclusion. Further, Carol Boucher, Bradley's nurse-caseworker from WIC, testified that the ratio of a child's height to his weight is more important as an indicator of malnutrition than the

height and weight themselves and that Bradley's height-to-weight ratio was consistently within the range WIC considered to be adequate. She further testified that tests of his hemoglobin always showed he was not anemic and that genetics are a major factor in determining a child's stature. Darrin is 5 feet 6½ inches tall; the record does not indicate Stacy's height.

As further evidence of Stacy's alleged failure to provide Bradley with adequate nutrition, Darrin points to an incident in which Tami Leigh, the home interventionist from the Children's Foundation, saw Stacy put only a tablespoon of food into a large bowl to prepare to feed Bradley. The incident occurred when Bradley was four months old and just beginning to eat baby food. Leigh testified that she explained to Stacy how much food a baby needs to eat and that, from then on, Stacy always fed him an appropriate amount of food. We find the record supports the conclusions that Bradley does not suffer from failure-to-thrive syndrome due to malnourishment and that Stacy understands how to provide him with adequate nutrition.

■ ■ Moreover, Stacy's developmental disability is not the only factor to be considered. In determining the child's best interest, trial courts are to consider the following factors:

"(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian ***;

(7) the occurrence of ongoing abuse as defined in *** the Illinois Domestic Violence Act of 1986 ***; and

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602(a)(1) through (a)(8) (West 2000).

Many of these additional factors favor an award of custody to Stacy. Currently, Bradley has close bonds with Stacy's mother and sisters. He spends time with Stacy's sister, Linda, several times each week. Although he also enjoys relationships with Darrin's family, they reside in Missouri and have not played so prominent a role in his life as have Stacy's mother and sisters. Further, the record shows that Bradley is happy and well-adjusted in the home he now shares with Stacy and Nadine. Since the hearing, he has begun preschool. Granting custody to Darrin would diminish Bradley's ties to Stacy's family and require

him to adjust to a new home, school, and community. We, therefore, conclude the record as a whole supports the trial court's determination.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and TURNER, JJ., concur.