NO. 4-03-0142

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of ) Appeal from

JAMI M. SPENT, ) Circuit Court of

Petitioner-Appellant, ) Macon County­

and ) No. 99D384

BRADLEY K. SPENT, )

Respondent-Appellee. ) Honorable

) John K. Greanias,

) Judge Presid­ing.

PRESIDING JUSTICE MYERSCOUGH delivered the opinion of the court:

In February 2003, the trial court removed custody of A.S. from petitioner, Jami M. Spent, and awarded custody to respondent, Bradley K. Spent (Brad).  Jami appeals, arguing that  (1) the trial court erred when it failed to strike and dismiss Brad's petition to modify custody; (2) the trial court erred when it granted a change in custody because Brad failed to establish by clear and convincing evidence that custody with her constituted a serious endangerment to the physical, mental, moral, or emotional health of A.S.; (3) the trial court's decision to award sole custody to Brad was against the manifest weight of the evidence; and (4) the trial court's finding her in indirect civil contempt was against the manifest weight of the evidence.  We affirm.

I. BACKGROUND

Because the parties are familiar with the facts and acrimonious history of this case, we set forth only those facts necessary to understand this court's disposition.  The parties married on July 16, 1994, and one child was born to the marriage, A.S. (born June 26, 1994).  Jami filed a petition for dissolution of marriage on June 28, 1999.  The parties filed a written stipulation, agreeing that it was in A.S.'s best interests that the parties have joint custody, that A.S. should reside with Jami, and Brad would have reasonable visitation.  In July 1999, the trial court entered a judgment of dissolution of marriage, awarding the parties joint custody of A.S. pursuant to the written stipulation.

On October 10, 2001, Brad filed a motion for scheduled visitation.  On October 31, 2001, the trial court held a hearing on Brad's motion and entered an order setting forth Brad's visitation schedule and location for the exchange.  On that same day, Jami filed a petition to terminate joint legal custody and to award her custody and to restrict Brad's visitation.  On November 1, 2001, Jami filed a motion to vacate the visitation order.  On November 2, 2001, Brad filed a petition for rule to show cause against Jami, alleging she willfully and contumaciously failed to comply with the court's visitation order.  On November 30, 2001, Brad filed a petition for indirect civil contempt, alleging Jami denied him visitation on several occasions.

In April 2002, the trial court conducted a hearing on the issues pending, conducted an 
in
 
camera
 interview of A.S., and denied Jami's petition to terminate joint legal custody, to award custody to her, and to restrict Brad's visitation.  The court entered further orders regarding the other pending matters.

On October 15, 2002, Jami filed a petition to change the pickup place and time that was scheduled for hearing on October 28, 2002.  On the date of the hearing, Brad's attorney requested a continuance.  Jami objected, and the court stated:

"Well, if what you are worried about, ma'am, is somehow you are going to be in noncompliance with the court order because of your lack of vehicle, you filed your motion and that testimony would be heard.  So if your concern is some amount of contempt on account of that, that should not be a concern to you."

On December 20, 2002, Jami filed a verified petition for an order of protection as a result of a physical incident that occurred on December 16, 2002, at the Argenta High School.  The trial court entered an emergency order of protection and specifically told Jami that she was still under court order to provide Brad visitation, which was not going to be stopped by the emergency order of protection.

In January 2003, Brad filed a petition for adjudication of indirect civil contempt, a petition for modification of judgment as to custody, and a petition for sanctions.  Jami filed a motion to strike and dismiss the petition for modification of judgment as to custody.  The trial court held a hearing on January 31, 2003, and February 3, 2003, on the pending petitions and motions.  The evidence revealed that fighting and cussing among the parties, family members, and Jami's fiancé occurred during visitation exchanges, at public events, and in front of A.S.  The police were often called.  The visitation exchanges were to occur at a gas station that was located approximately one mile from the parties' respective residences.  The last visit Brad had with A.S. was on October 31, 2002, because Jami stopped bringing A.S. to the gas station.  Brad did not have his visitation with A.S. over Christmas.  Several witnesses testified, giving varying accounts about an incident that occurred in December 2002 after A.S.'s Christmas program, where there were words between Jami, Brad's wife, Jami's fiancé, and Brad that resulted in an altercation between Brad and Jami's fiancé, all of which took place in front of A.S.  There was also testimony that the parties make disparaging remarks about each other in front of A.S.

Jami testified that she lives with her fiancé, Joe Masters, in his house.  She has two older daughters who do not live with her.  Jami does not own a vehicle.  She is employed at a tanning center, where she works nights and weekends  (4 p.m. to either 8 or 9 p.m.), working between approximately 20 and 26 hours a week.  Joe usually takes her back and forth to work, but she sometimes drives herself in Joe's truck.  Joe owns two business trucks, one of which is a "dump truck."  Joe previously owned a Cadillac that she sometimes drove.  He planned on selling the Cadillac, which meant that she would not have a vehicle to drive, and that was the reason she wanted to change the visitation exchange to take place in her driveway rather than at the gas station.  Jami admitted that she called A.S.'s school and asked that they prohibit Brad from visiting A.S. at her school and also made that request in the order of protection that was ultimately denied. 

Brad testified that he was told that Jami and Joe did not want Candy, Brad's wife, on Joe's property.  He further testified that there was one incident where Candy went to the gas station to pick up A.S. for Brad's scheduled visit, and Joe would not release A.S. to Candy.  Joe said that Jami told him to release A.S. to Brad only.  Brad testified that Jami never told him that she did not want anyone else to pick up A.S.  

Brad did not want the exchanges changed to Joe's driveway because it would probably result in another order of protection against him and more lost time with A.S.  Brad testified that he heard "through the courts" that Jami did not have a vehicle, but she did not speak to him about the situation.  He has not been able to have his court-scheduled visitation since October 31, 2002, and A.S. had not called him.  He admitted that he did not call her because "[c]alling her just causes problems."   Candy testified that she is employed by Wellness Center and works evenings "a lot of the times."  She and Brad have a five-month-old daughter.  Candy testified that she has a very good relationship with A.S.  She loves A.S.  When asked how she felt about fostering a relationship between A.S. and Jami, Candy testified that "[A.S.] should see her mother.  I have a daughter and I wouldn't expect or wouldn't want someone to take my daughter from me.  I think that she should see her mother."

Joe testified that he is an independent landscaping contractor.  He owns the house but rents the ground.  He also has a snow-removal operation as part of his business.  He owns a one-ton dump truck and leases a 2001 C-71 pickup, on which he can only put 12,000 miles a year.  He uses the pickup for snow removal.  There have been occasions where he told Jami that she could not drive the truck to the gas station for visitation exchanges.  He testified that Jami has permission to drive his truck at certain times after she pays him $5.  Joe testified about some of the incidents that occurred at visitation exchanges and that there had been times when he felt physically threatened by Brad.  Joe testified about the September 27, 2002, incident where he would not let A.S. go with Candy.  He further testified that after that incident, he refused to furnish his vehicle for the visitations, and he refused to drive to the exchange.  He testified that "[i]t's not my responsibility."  He testified that he got mad, and Brad should have appreciated the fact that he would stop his work to drive A.S. to the visitation exchange location.  He sold the Cadillac on approximately November 6 or 7, 2002.

Joe testified that he has a wonderful relationship with A.S.  He takes her to different events when Jami is working.  He testified that the situation is starting to effect A.S.  "[T]he situation that she's in because she has had two or three papers brought home that wasn't [
sic
] very good.  She has been to a counselor a few more times than--really, if she wasn't effected [
sic
] about this, it wouldn't be necessary to go to counseling."

After closing argument, the trial court found that Jami failed to prove abuse by a preponderance of the evidence as alleged in her petition for an order of protection and terminated the order of protection.  The court also denied Jami's petition for a change of pickup time and location and granted Brad's petition for indirect civil contempt.  The court specifically found Jami's conduct was willful, contumacious, and knowing.  The court also granted Brad's modification as to child custody, terminated joint custody, and awarded Brad sole custody and control of A.S. with specified visitation with Jami.

This appeal followed.

II. ANALYSIS

A. Failure To Strike and Dismiss

Jami argues that the trial court erred when it failed to strike and dismiss Brad's petition to change custody.  Specifically, she contends that Brad filed his petition within two years of a custody determination.  Therefore, he was required to attach an affidavit as required by section 610(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/610(a) (West 2000)), which he failed to do.  Brad argues that the trial court correctly found that section 610(a) of the Dissolution Act did not apply.  We agree with Brad.  Initially we note that the parties provide some discussion regarding whether Jami waived her right to require conformity with that section.  Because of our resolution of the applicability of section 610(a), we need not address the waiver argument.

Sections 610(a) and (b) of the Dissolution Act establish a dual-step process for modification petitions filed and heard within two years of the last custody judgment.  750 ILCS 5/610(a), (b) (West 2000).  Section 610(a) empowers a trial court, under certain circumstances, to grant a hearing on the petition for modification, with the ultimate decision on modification to be made pursuant to the legal standards set forth in section 610(b).  
Department of Public Aid ex rel. Davis v. Brewer
, 183 Ill. 2d 540, 554, 702 N.E.2d 563, 569 (1998).

Section 610(a) provides:

"Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral[,] or emotional health."  750 ILCS 5/610(a) (West 2000).

Section 610(b) specifies the legal standards a court must use in determining whether to grant a petition to modify custody and applies to all petitions, regardless of whether they are filed and heard before or after two years from the date of entry of the custody judgment.  
Brewer
, 183 Ill. 2d at 555, 702 N.E.2d at 569.

In June 1999, the parties stipulated that joint custody was in A.S.'s best interests.  In July 1999, the trial court entered a judgment of dissolution and awarded the parties joint custody of A.S. with Jami having physical custody.  In October 2001, Jami filed a petition to terminate joint legal custody, to award custody to her, and to restrict Brad's visitation.  After a hearing on this petition, the court found that no persuasive evidence existed that visitation by the child with respondent, his family, or his friends presents any danger to the child's physical, psychological, or moral safety.  In essence, the court found that Jami failed to present evidence sufficient to satisfy section 610(b) and warrant a custody modification.  See 
Brewer
, 183 Ill. 2d at 556, 702 N.E.2d at 569-70 (after meeting the procedural prerequisite of subsection (a), the case then proceeds to an evidentiary hearing, where the trial court applies the legal standards contained in subsection (b) to determine whether the modification petition should be granted).  In April 2002, the court denied Jami's petition to terminate joint legal custody, to award custody to Jami, and to restrict Brad's visitation.  

Jami argues that the trial court's April 2002 denial of her petition was a custody judgment and, therefore, that date was the point at which the two-year provision of section 610(a) began to run.  As a result, Brad's petition for modification of custody, filed in January 2003, was filed within two years of that April 2002 custody judgment thereby triggering the requirements of section 610(a).  We disagree.  The parties have cited no cases, and our research has not revealed any cases, that hold that a denial of a petition to terminate joint custody amounts to a "custody judgment" thereby triggering the two-year provision of section 610(a).  In fact, we conclude just the opposite.  We find that a denial of a petition to terminate joint custody or a motion to modify custody does not amount to a "custody judgment."    Here, the trial court's denial of Jami's petition in no way modified the original custody judgment entered in July 1999.  Rather, the denial simply maintained the status quo of that original custody judgment.  In 
In re Marriage of Spangler
, 124 Ill. App. 3d 1023, 1026, 464 N.E.2d 1120, 1122 (1984), this court held that the original custody order stands as the judgment of the court as to the circumstances before the court at the time of entry and that judgment is not changed by a grant of relief under section 610.  This court acknowledged that although the granting of such relief is said to "modify" the judgment of custody, actually, a new judgment is entered based on new facts and circumstances.  
Spangler
, 124 Ill. App. 3d at 1026, 464 N.E.2d at 1122.  Here, the trial court denied Jami relief under section 610(b).  Therefore, the original custody judgment was neither "modified" nor was a new judgment entered.  In contrast,  in
 
In re Marriage of Eleopoulos
, 186 Ill. App. 3d 374, 379, 542 N.E.2d 505, 508 (1989), the parties stipulated to a change in the original custody order whereby custody of one child was transferred but custody of the other child was not changed, thereby resulting in the trial court entering an order that constituted a new custody judgment.  

The trial court correctly found that the April 2002 ruling on Jami's petition was not an order affecting custody within the meaning of section 610(a), 
i.e.
, that started a new two-year waiting period or invoked the affidavit requirement.  Because Brad's petition to modify custody was filed some three years after the custody judgment in July 1999, section 610(a) was inapplicable. 

B. The Trial Court's Custody Decision

Jami contends that she did not consent to a termination of joint custody.  Further, the parties did not stipulate to a termination of joint custody, and only one party filed a petition to modify the joint-custody agreement.  Therefore, Jami maintains that the trial court should have proceeded under section 610(a).  We disagree for the reasons stated.  We note, however, we agree that the parties did not stipulate that the joint-custody agreement should be terminated.  We disagree, though, that Brad was the only party to file a petition to terminate joint custody.  Jami filed her petition in October 2001 requesting, in part, to terminate joint custody.  The fact that no formal stipulation or agreement was reached is irrelevant.  
In re Marriage of Ricketts
, 329 Ill. App. 3d 173, 178, 768 N.E.2d 834, 838 (2002).  Because each party filed a petition seeking sole custody, they effectively stipulated to terminate the joint-custody arrangement and agreed that a change in circumstances warranted awarding custody to only one of the parents.  
In re Marriage of Lasky
, 176 Ill. 2d 75, 81, 678 N.E.2d 1035, 1038 (1997); see also 
In re Marriage of Wycoff
, 266 Ill. App. 3d 408, 412, 639 N.E.2d 897, 901 (1994) (finding the change-in-circumstances clause allows a trial court to terminate a joint-custody agreement whenever it becomes apparent that the parents cannot cooperate in the child's best interests).  Therefore, once both parties moved to terminate the joint-custody agreement (indicating a change of circumstances had occurred), the trial court, pursuant to section 610(b), had to terminate the joint-custody arrangement and make any modification that was in the child's best interests.

Alternatively, Jami argues that the trial court's decision to award sole custody to Brad was against the manifest weight of the evidence.  Specifically, Jami contends that the evidence failed to overcome the presumption in favor of the present custodial parent.  We disagree.

The trial court should consider all relevant factors, including those listed in section 602 of the Dissolution Act (750 ILCS 5/602 (West 2000)), when making child custody determinations and decide what custodial order serves the child's best interest.  
In re Marriage of Seitzinger
, 333 Ill. App. 3d 103, 107-08, 775 N.E.2d 282, 286 (2002).  A custody determination inevitably rests on the parties' temperaments, personalities, and capabilities, and the witnesses' demeanor.  
In re Marriage of Felson
, 171 Ill. App. 3d 923, 926, 525 N.E.2d 1103, 1105 (1988).  Because the trial court is in a far better position to "observe the temperaments and personalities of the parties and assess the credibility of the witnesses," the reviewing court affords great deference to the trial court's best interests findings.  
In re Marriage of Stopher
, 328 Ill. App. 3d 1037, 1041, 767 N.E.2d 925, 928 (2002).  We acknowledge that stability and continuity are major considerations in custody decisions, so that a presumption exists in favor of the present custodian.  
Wycoff
, 266 Ill. App. 3d at 410, 639 N.E.2d at 900.  However, once a trial court has determined that the presumption in favor of the present custodian has been overcome, we are not to disturb that determination unless it is against the manifest weight of the evidence, is manifestly unjust, or results from a clear abuse of discretion.  
Stopher
, 328 Ill. App. 3d at 1041, 767 N.E.2d at 929.  

At the conclusion of the February 2003 hearing, the trial court found that the legislative presumption favoring the finality of the prior custody judgment had been overcome by clear and convincing evidence, proving that a change occurred in the circumstances of the child and parties, terminated joint custody, and awarded sole care, custody, and control of A.S. to Brad.  The court explained the basis of its decision, stating:

"Now, the basis for the [c]ourt's change of custody is that the [c]ourt does find that there's been a change of circumstances with the child and her custodian and [Brad] since the last custody order.  The modification is necessary to serve the best interests of the child.  This was not punishment.  This is the [c]ourt deciding what is going to be in this minor's best interests under all of the circumstances for the foreseeable future."

The court clearly considered A.S.'s current custodial environment but determined that the presumption in favor of preserving this relationship was rebutted by the evidence presented.

Further, in deciding custody under the best-interest-of-the-child standard, the court shall consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."  750 ILCS 5/602(a)(8) (West 2000).  The record is replete with evidence that Jami was unwilling to facilitate and encourage a close and continuing relationship between A.S. and Brad.  In its written memorandum and orders, the court found:

"The evidence clearly established that [Jami] wilfully failed to foster a close and continuing relationship between the child and her father by denying visitation, denying telephone contact, and making disparaging remarks in the presence of the child.  There is no evidence upon which this [c]ourt may reasonably infer that [Jami] will change her conduct.  [Jami's] inappropriate conduct adversely affects the child and it is a relevant factor in determining the best interest of the child."

The record demonstrates that the trial court also considered the fact that Jami had undertaken new employment, requiring her to work evenings and weekends, working approximately 20 to 26 hours per week, which would not enable her to provide care and supervision for A.S.  In contrast, respondent was married and maintained a home for his wife and infant daughter, with whom A.S.'s interaction and interrelationship would be enhanced if A.S. were living with her infant sister.

We find the record in the present case supports the trial court's findings and, therefore, its judgment was not against the manifest weight of the evidence.

C. The Trial Court's Indirect Civil Contempt Finding

Jami argues that the trial court's finding that she was in contempt of court was against the manifest weight of the evidence.  Specifically, Jami contends that on October 28, 2002, Judge Webber assured her that her lack of a vehicle would not be held against her.

Civil contempt, unlike criminal contempt, consists generally of failing to do something ordered by a court, and the result is the loss of a benefit or advantage to the opposing party, with the dignity of the court being only incidentally involved.  
People v. City of East St. Louis
, 206 Ill. App. 3d 626, 634, 564 N.E.2d 1372, 1377 (1990).  Contempt that occurs outside the presence of the court is classified as indirect contempt.  
City of East St. Louis
, 206 Ill. App. 3d at 637, 564 N.E.2d at 1379.  The existence of an order of the court and proof of willful disobedience of that order are essential to any finding of indirect contempt.  
People v. Wilcox
, 5 Ill. 2d 222, 228, 125 N.E.2d 453, 456 (1955).  The burden rests upon the alleged contemnor to show that noncompliance was not willful and contumacious and that he or she has a valid excuse for failure to follow the court order.  
People v. Stanley
, 60 Ill. App. 3d 909, 911, 376 N.E.2d 1095, 1097 (1978).  Whether a party is guilty of contempt is a question of fact for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.  
In re Marriage of Logston
, 103 Ill. 2d 266, 286-87, 469 N.E.2d 167, 176 (1984).

In support of her argument, Jami relies on what she characterizes as an "assurance by Judge Webber on October 28, 2002[,] that her lack of vehicle could not be held against her."  We find Jami's reliance misplaced.  We conclude, after considering the trial court's comments in context, that the court was simply telling Jami that when her petition was heard and if the evidence revealed that the sole reason she was not able to facilitate visitation was because she did not have a vehicle, then she would not have to be concerned.  If that were what the evidence revealed, we would agree with the court's statement.  However, the evidence showed that Jami used the lack of a vehicle as one more excuse to deny Brad visitation with A.S.  

Assuming, 
arguendo
, the trial judge's comments amounted to an "assurance" that no contempt would be found, we conclude that the later admonishments from Judge White sufficiently informed Jami that she was still under court order to permit Brad to have visitation with A.S., and she needed to comply with that order.

In the instant case, the evidence supports the trial court's findings that Jami's conduct was willful, contumacious, and knowing.  We conclude, therefore, that the trial court's judgment was not against the manifest weight of the evidence.

III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

COOK and McCULLOUGH, JJ., concur.