# Illinois Official Reports

## Appellate Court

---

### *In re M.S.*, 2015 IL App (4th) 140857

---

| | |
|---|---|
| Appellate Court Caption | In re: M.S., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. GEORGE H. SHELDON, Acting Director of The Department of Children and Family Services; and DEBRA DYER-WEBSTER, Guardianship Administrator of The Department of Children and Family Services, Respondents-Appellants.–In re: P.S., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. GEORGE H. SHELDON, Acting Director of The Department of Children and Family Services; and DEBRA DYER-WEBSTER, Guardianship Administrator of The Department of Children and Family Services, Respondents-Appellants. |
| District & No. | Fourth District<br>Docket Nos. 4-14-0857, 4-14-0860 cons. |
| Filed | April 14, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, Nos. 13-JA-104, 13-JA-105; the Hon. Claudia S. Anderson, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Paul Racette (argued), Assistant Attorney General, of counsel), for appellants.<br><br>Panorea Tsilimigras, Assistant State's Attorney, Rebecca Parkhurst, Assistant Public Defender, and Rana Meents, of Dukes, Ryan, Meyer & Freed, Ltd., all of Danville (David J. Robinson (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
                    Justices Knecht and Appleton concurred in the judgment and opinion.


**OPINION**

¶ 1        M.S. (born September 1, 2013) and P.S. (born January 31, 2012) are siblings who were
           removed from their parents' care and, during juvenile abuse and neglect proceedings, placed in
           the custody and guardianship of the Illinois Department of Children and Family Services
           (DCFS). In September 2014, the juvenile court entered an order in each minor's case finding
           Bobbie Gregg, DCFS's Acting Director, and Debra Dyer-Webster, DCFS's guardianship
           administrator, in indirect civil contempt for failing to follow court orders. Respondents appeal
           in each minor's case, arguing the court's contempt orders were defective in several respects
           and the court abused its discretion. Their appeals have been consolidated. (On appeal, George
           H. Sheldon, DCFS's current Acting Director, has been substituted as a party for Gregg by
           operation of law (735 ILCS 5/2-1008(d) (West 2012)).) We reverse.


¶ 2                                      I. BACKGROUND
¶ 3        In September 2013, M.S. and P.S. were removed from their parents' care and the State filed
           petitions for adjudication of wardship, alleging the minors were neglected (case No.
           13-JA-104 concerned M.S. and case No. 13-JA-105 concerned P.S.). Specifically, the State
           asserted the minors' environment was injurious to their welfare due to their mother's drug use
           (count I of each petition) and because M.S. was born with an amount of a controlled substance
           in her system (count II of each petition). On September 9, 2013, the juvenile court ordered the
           minors placed in the temporary custody of DCFS. On December 23, 2013, the court entered
           adjudicatory orders, finding count I of the State's petitions had been proved by a
           preponderance of the evidence based upon admissions by the minors' mother and stipulations
           by their father. On March 28, 2014, the court conducted a dispositional hearing and entered
           orders adjudicating M.S. and P.S. neglected, making them wards of the court, and placing
           custody and guardianship of the minors with DCFS.

¶ 4        The record indicates DCFS assigned Lutheran Social Services of Illinois (LSSI) to handle
           the minors' cases. On January 22, 2014, LSSI filed dispositional reports in each case, which
           showed M.S. and P.S. had been placed in a relative foster home with their maternal grandfather
           and step-grandmother. That placement occurred the same day the minors were removed from
           their parents' care and continued through the date of the March 28, 2014, dispositional hearing
           and orders.

¶ 5        The record shows that, shortly following dispositional proceedings, the minors'
           grandfather submitted to a drug test and tested positive for tetrahydrocannabinol (THC) and
           opiates. Although the appellate record contains no order requiring him to be drug tested, the
           record does indicate the juvenile court had issued a "standing drug drop order" affecting foster
           parents in juvenile abuse and neglect cases in Vermilion County.

¶ 6    Following the grandfather's positive drug test, LSSI determined it was unnecessary to remove M.S. and P.S. from the home and, instead, developed a plan to monitor the situation. On April 10, 2014, LSSI filed a "Foster Parent Supervision Plan" in each case. Along with its supervision plan, LSSI summarized the circumstances which resulted in the plan, stating as follows:

> "Based on a recent positive drug test for [the grandfather], LSSI has staffed this case to determine if placement can be stabilized in the current home. [The grandfather] tested positive for THC and Opiates. He has a prescription for Hydrocodone, explaining the opiate test, and admitted to using a small amount of marijuana. He denied regular use, stating that he had not used marijuana in more than a year prior to using recently. He stated he used outside the home and was not in a care-giving role at the time. The positive drug test was discussed with the [grandparents], and LSSI is informing the court of the positive drug test and creating a supervision plan to monitor safety and ensure no ongoing drug use occurs."

¶ 7    On June 19, 2014, LSSI filed permanency review reports in each case. Those reports showed that, on May 23, 2014, M.S. and P.S. were removed from their relative foster placement and placed together in a traditional foster home. The record indicates removal of the minors from their grandparents' home occurred because LSSI discovered the step-grandmother had a previous indicated finding for sexual abuse. On July 24, 2014, the juvenile court entered permanency orders, finding that neither parent had made reasonable and substantial progress or reasonable efforts toward returning the minors home. The court continued custody and guardianship of the minors with DCFS but ordered LSSI removed from the cases.

¶ 8    Also on July 24, 2014, the juvenile court entered a rule to show cause on its own motion in both cases. It ordered respondents; Todd Beard, an LSSI supervisor; and Carol Bradford, an LSSI site supervisor, to appear before the court and "show why he/she should not be held in contempt of Court and punished." In support of its rules to show cause, the court made the following findings:

> "3. Pursuant to testimony by caseworker Lauren Bennett heard on June 27, 2014, [LSSI] made a decision to leave the children in a relative foster home *after* the foster parent had tested positive for marijuana (THC). This decision was made by the caseworker's supervisor, Todd Beard, and his supervisor, Carol Bradford, both employees of [LSSI].
>
> 4. This Court has had multiple meetings with DCFS and case agencies including (LSSI) since 2013, and has made it very clear through direct orders that foster parents engaging in the use of illegal drugs would not be tolerated as it was an injurious environment for the wards, and that the wards should be moved if the foster parent has a drug issue.
>
> 5. Also[,] pursuant to the testimony by caseworker Lauren Bennett heard on June 27, 2014, the agency's attempts to get the foster parent licensed were unsuccessful due to an issue with the background check on the maternal [step-]grandmother foster parent. She was unable to be licensed as a foster parent because she had been Indicated for *** Sexual Penetration. Ms. Bennett testified that she had looked into why this had not been found out before that point in time, and the reason what [*sic*] that DCFS had never cleared nor conducted a background check of the placement initially upon

placing the wards in the foster home. No background check was done by DCFS at all on the foster home during 10 months between placement at the Temporary Custody Hearing and the Permanency Hearing on June 27, 2014.

　　6. Furthermore, when the minors were finally moved from the foster home following the agency learning of the foster parent's Indicated past, no drug drop was conducted on the incoming foster parent." (Emphasis in original.)

Additionally, the court stated it found that respondents and LSSI supervisors "exhibited a willful and contumacious and continuous defying" of the court's orders. In particular, it noted LSSI's decision "to allow [M.S. and P.S.] to remain in the maternal relative foster home after having learned of illegal drug use of the foster parent."

¶ 9　　On September 2, 2014, respondents filed memorandums of law in each minor's case, responding to the juvenile court's rule to show cause. They asked that the court "discharge the Rule" on the basis that it failed to give notice of a specific order they violated and failed to allege any facts supporting a finding of willful disobedience of the court's orders. Respondents also argued they were not in "present violation" of an order "for which civil contempt would lie to compel compliance." Further, they asserted that in the event the court's rule contemplated punishment for criminal contempt, the requisite criminal contempt procedures had not been followed.

¶ 10　　On September 5, 2014, the juvenile court conducted a hearing on its rule to show cause. Both respondents testified. Dyer-Webster stated she had been the guardianship administrator for DCFS for approximately 15 months and her role was to look out for the welfare of children placed in the custody and guardianship of DCFS. She testified DCFS was responsible for the children in its care and LSSI was an agency with which DCFS contracted. Dyer-Webster estimated she was the guardian for approximately 15,000 children and did not have the opportunity to review every court order issued in a case. Instead, she relied on the caseworkers and supervisors that were assigned to each particular case to assist her. Ultimately, however, she was the individual responsible for making sure everything was going well with the children in DCFS's care.

¶ 11　　Dyer-Webster stated she was familiar with the case involving M.S. and P.S., as well as a "standing order of the Court for foster parent drug drops." She did not know the precise date she became familiar with the drug drop order but estimated it was two to three months prior to the September 2014 hearing and after she learned of the juvenile court's rule to show cause. Dyer-Webster testified she was not identified by name in the drug drop order as having to facilitate the drug drops. Further, she denied that she had "willingly" violated any particular order of the court or that she was even aware that she had violated a court order.

¶ 12　　Gregg testified that, as DCFS's Acting Director, she was responsible for overseeing DCFS's operations, including operations in the office of DCFS's guardian. She stated she was aware of the juvenile court's "standing order relating to drug drops" but did not believe she learned of that order until after the rule to show cause. Gregg testified that she did not personally review orders of the juvenile court relating to wards unless an order was brought to her attention by the guardian or DCFS's general counsel. She denied that she had ever knowingly violated an order of the juvenile court.

¶ 13　　Todd Beard testified he previously worked as a foster care supervisor for LSSI and had been a part of the decision to leave M.S. and P.S. in their grandparents' home after their grandfather tested positive for THC. Beard testified the minors' grandfather took a drug test on

March 28, 2014, and, on April 2, 2014, LSSI was notified of the positive result. Beard supervised the minors' caseworker, who informed him of the positive result. In turn, Beard had a meeting with his supervisor, Carol Bradford, to determine whether to remove M.S. and P.S. from their placement. During the meeting, Bradford contacted DCFS by telephone and it was determined that the minors would remain in their grandparents' home with a safety plan. Beard testified the safety plan was to include additional drug testing, additional unannounced visits by LSSI staff, and notification to the court.

¶ 14 Upon questioning by the State, Beard acknowledged the existence of "a standing drug drop order that indicated that the *** foster parents needed to be drug dropped" but asserted that order "did not clarify what was to happen in the event that there was a positive drug test." Further, Beard did not recall any concrete statement by the juvenile court judge–either in court or during meetings with DCFS–that minors should not remain in a foster placement if a foster parent tested positive for drugs. Beard testified that, on April 2, 2014, the same day he learned of the grandfather's positive test, he sought clarification on the issue from the juvenile court. He stated he attended a hearing that day on a different case and then brought the matter involving M.S. and P.S. to the court's attention.

> "I asked in this courtroom specifically about this event. I identified the positive drug test. These are the options that we see[:] drug testing, drug treatment, remain in the home with a safety plan, or removal of the children. And what I was told at that time was to submit a letter to the Court identifying the issue, which I did not personally do, but my case[ ]worker did immediately, and we never heard back from the Court about what to do. By the time we had another case–by the time we had another hearing for this case, the children had been removed for another issue."

¶ 15 Beard testified he brought the matter to the juvenile court's attention to clarify what the court's expectation was in the event of a positive foster parent drug test. He stated he "did not know what was supposed to happen" but "felt like" the minors should have been removed. However, he did not believe at that time that he was violating a court order. Additionally, he testified he memorialized his interaction with the court in a note, which was admitted into evidence at the hearing. Beard's note stated as follows:

> "This supervisor met with courtroom staff following a hearing. Present and involved in the discussion were Judge [Claudia] Anderson, [a guardian *ad litem* (GAL)], [Assistant State's Attorney Panorea Tsilimigras], and [a] DCFS Court monitor. Judge Anderson stated that this case had a positive drug test for the foster parent. She stated LSSI should report this along with our investigation and plan to the court. She then left the courtroom. GAL spoke with court monitor for DCFS, who noted that the foster parents are afforded due process through the department, and immediate removal for a positive drug test is not warranted if there are no other concerns, also noting that there are 2 foster parents and only one tested positive. I shared the plan LSSI has ***. I agreed to create a written document to present to the court by the end of this week, while also creating and implementing the plan noted in previous notes on this matter from today. All parties agreed."

Beard acknowledged that neither the juvenile court judge nor the assistant State's Attorney told him it was okay to leave minors with foster parents who had a positive drug drop. However, he also testified that he did not receive a direct order to remove M.S. and P.S. from their grandparents' home.

¶ 16    Beard additionally testified that it was his understanding that a "placement clearance" had been done when M.S. and P.S. were initially placed with their maternal grandfather and step-grandmother. He stated a "placement clearance" was performed by calling the "placement clearance desk" and providing information about the prospective foster parents. Beard testified the "placement clearance desk" would perform a (1) Child Abuse and Neglect Tracking System (CANTS) check to determine if the foster parents had a history of child abuse and neglect and (2) Law Enforcement Automated Data Systems (LEADS) check to determine the foster parents' criminal backgrounds. Although he believed a "placement clearance" had been performed on the maternal grandparents in this case, he acknowledged that information showing the minors' step-grandmother "had a CANTS hit for sexual abuse was not identified at that time." Beard testified the children were removed from the grandparents' home the same day LSSI was "notified of the positive CANTS."

¶ 17    Shawn Gavel testified he worked for DCFS as a child protection advanced specialist. He was familiar with M.S. and P.S. and acted as the investigator on their cases. Gavel stated he performed background checks on various individuals involved in the cases, including the minors' maternal grandfather and step-grandmother. He stated that the background checks were done before the minors were placed with the grandparents and placement clearance was given. According to Gavel, background checks entailed obtaining information from the foster parents and calling "into a placement clearance CANTS and LEADS unit." He acknowledged that the information used in performing the background check came primarily from the foster parents.

¶ 18    At the conclusion of the evidence, the juvenile court stated it viewed the matter as presenting "a civil contempt issue with an opportunity to purge." It then determined as follows:

> "I'm holding [respondents] in contempt of the Court orders entered in 2013 JA 104 and 105 [(the cases involving M.S. and P.S)], as identified in the petition in the rule, and in the memorandum of law and the Respondent's [*sic*] arguments, as well as Petitioner's today. In some sense, you can say the issue is moot. I don't think so. I think the purge is to do what you're ordered to do. There has to be a drug drop within 24 hours of placement. If it is positive, those children are removed. *** I think it's time that perhaps [DCFS] also did an internal audit to determine the efficiency of their procedures, because I think it's pretty widely accepted that their procedures are a systematic failure. Those are the two things I think should be done for purge, and they would be so ordered."

The court then held that the "punishment" if its purge provisions were not followed was that respondents would be required to "attend no less than five court hearings a month" in Vermilion County.

¶ 19    On September 14, 2014, the juvenile court entered written orders in both minors' cases and held respondents in civil contempt of court. Its written orders were consistent with its oral ruling, providing as follows:

> "[Respondents] have the opportunity to purge themselves of this contempt finding by (1) following the Orders of the court in all DCFS cases pending in the Fifth Judicial Circuit, Vermilion County, Illinois, including a drug drop with every DCFS foster placement within 24 hours of placement, and removing the child or children from the placement if the drug drop reading is positive; and (2) conducting an internal audit of [DCFS] to determine the efficiency of DCFS procedures.

"If Respondents do not purge themselves of the civil contempt of court by complying with the foregoing, they are hereby sentenced to the following punishment: Respondents are required to attend no less than five court hearings in a month, including termination and permanency hearings."

¶ 20 Respondents filed interlocutory appeals in each case pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010). The cases have been consolidated on appeal and the office of the State's Attorneys Appellate Prosecutor has filed a brief opposing respondents' position on appeal.

¶ 21                                                 II. ANALYSIS
¶ 22                                    A. Motions Taken With the Case
¶ 23 Initially, we address two motions filed by the State on appeal, which we ordered taken with the case–a motion to dismiss respondents' appeals and a motion to strike an exhibit that respondents attached to their response to the State's motion to dismiss. For the reasons that follow, we deny both motions.

¶ 24 In connection with its motion to dismiss, the State argues no jurisdiction exists for respondents' appeals because contempt orders are not final and appealable until the trial court imposes a sanction upon the contemnor. In particular, Illinois Supreme Court Rule 304(b)(5) (eff. Feb. 26, 2010) provides that "[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty" is appealable. The State contends the juvenile court's contempt orders in the instant cases did not *impose* a sanction or punishment and, instead, merely "provided for a punishment 'if' [respondents] failed to comply" with the court's purge provisions. It maintains that, as a result, the court's contempt orders were not final and reviewable.

¶ 25 Respondents argue the juvenile court's contempt orders are injunctive in nature and, as a result, their appeals may be heard pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010), which provides for appeals from an interlocutory order "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." They filed a response to the State's motion to dismiss and attached as an exhibit an order from this court denying the State's motion to dismiss appeals DCFS filed in another set of consolidated juvenile cases from Vermilion County. This court's order noted DCFS's appeals concerned "the question of whether the trial court's order regarding drug testing of prospective foster parents is injunctive" and set forth the Black's Law Dictionary definition of an injunction. *In re* L.R., Nos. 4-14-0364, 4-14-0365, 4-14-0366, 4-14-0367, 4-14-0368, 4-14-0369, 4-14-0370, 4-14-0371, 4-14-0372, 4-14-0373, 4-14-0374, 4-14-0375, 4-14-0376 cons. (Sept. 22, 2014) (order denying State's motion to dismiss appeal).

¶ 26 The State asks this court to strike respondents' exhibit, arguing it "is unrelated to this case." A court may take judicial notice of its own records. *People v. Jackson*, 182 Ill. 2d 30, 66, 695 N.E.2d 391, 409 (1998). Although we do not find respondents' exhibit dispositive of the issues presented by the State's motion to dismiss in the instant cases, we also find that it is not wholly unrelated to the issues presented. Therefore, we deny the State's motion to strike.

¶ 27 With respect to the State's motion to dismiss, we find it significant that respondents did not bring their appeals pursuant to Rule 304(b)(5), nor do they argue that it provides the jurisdictional basis for their appeals. In both their notices of appeal and appellant's brief,

respondents cite Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010), which, as discussed, provides for appeals from an interlocutory order "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." They argue the purge provisions in the juvenile court's contempt orders constituted injunctions and, therefore, appellate review may be had pursuant to Rule 307(a)(1). We note that the lack of an imposed penalty in connection with the juvenile court's contempt orders will not bar review pursuant to Rule 307(a)(1). Instead, pursuant to Rule 307(a)(1), we must determine whether the juvenile court's contempt orders can properly be construed as injunctive.

¶ 28        "To determine what constitutes an appealable injunctive order under Rule 307(a)(1) we look to the substance of the action, not its form." *In re A Minor*, 127 Ill. 2d 247, 260, 537 N.E.2d 292, 297 (1989). "Actions of the circuit court having the force and effect of injunctions are still appealable even if called something else." *A Minor*, 127 Ill. 2d at 260, 537 N.E.2d at 297. In the context of Rule 307(a)(1), the meaning of the term "injunction" is broadly construed. *A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298. Further, the supreme court has "described an injunction as 'a judicial process, by which a party is required to do a particular thing, or to refrain from doing a particular thing, according to the exigency of the writ, the most common sort of which operate as a restraint upon the party in the exercise of his real or supposed rights.' " *A Minor*, 127 Ill. 2d at 261, 537 N.E.2d at 298 (quoting *Wangelin v. Goe*, 50 Ill. 459, 463 (1869)).

¶ 29        To support their position with respect to Rule 307(a)(1), respondents rely on this court's decision in *Bloomington Urological Associates, SC v. Scaglia*, 292 Ill. App. 3d 793, 686 N.E.2d 389 (1997). There, the trial court found the defendant physician in indirect civil contempt for violating an agreed order not to compete with the plaintiff, a medical organization and the physician's former employer. *Scaglia*, 292 Ill. App. 3d at 797, 686 N.E.2d at 392. In connection with its contempt finding, the court ordered that the physician not be involved in the business of providing urological medical services and that he desist from certain specified conduct within the area and through the date previously agreed upon by the parties. *Scaglia*, 292 Ill. App. 3d at 797, 686 N.E.2d at 392. The physician appealed and argued appellate jurisdiction existed pursuant to Rule 307(a)(1). *Scaglia*, 292 Ill. App. 3d at 796, 686 N.E.2d at 392. We agreed the court's order was an appealable injunction under Rule 307(a)(1), noting the order "required [the physician] to refrain from doing several 'particular' things, and it operated as a restraint on his right to provide urological medical services to his existing patients." *Scaglia*, 292 Ill. App. 3d at 797, 686 N.E.2d at 392.

¶ 30        Here, the juvenile court's orders holding respondents in civil contempt required respondents to follow orders in pending Vermilion County cases, including "a drug drop with every DCFS foster placement within 24 hours of the placement, and removing the child or children from the placement if the drug drop reading is positive." The court also required respondents to conduct an internal audit of DCFS to determine the efficiency of its procedures. Like in *Scaglia*, the court's orders required respondents to do (or refrain from doing) several "particular" things. It also constrained DCFS's right to establish rules and regulations with respect to foster care and the placement of minors, as well as respondents' rights to oversee the manner in which DCFS functions.

¶ 31        We find further support for respondents' position in *In re R.V.*, 288 Ill. App. 3d 860, 681 N.E.2d 660 (1997). In that case, the First District held that a trial court's order requiring DCFS to videotape its interviews with children was "properly viewed as 'injunctive' and capable of

review pursuant to Supreme Court Rule 307(a)(1)." *R.V.*, 288 Ill. App. 3d at 865, 681 N.E.2d at 664. In so holding, the court noted "the orders appealed from directed DCFS to do, or not do, a particular thing, which placed a constraint on the Department's right to determine appropriate investigatory measures." *R.V.*, 288 Ill. App. 3d at 865, 681 N.E.2d at 664.

¶ 32    In its motion to dismiss, the State argues the juvenile court's contempt orders may not properly be viewed as injunctive. However, we find the State's arguments unpersuasive, in that the State focuses solely on the form of the court's order rather than its substance. Despite the label given to the court's order, it can substantively be viewed as injunctive. Thus, review pursuant to Rule 307(a)(1) is appropriate and we deny the State's motion to dismiss.

¶ 33                          B. Civil Contempt Order

¶ 34    On appeal, respondents argue the juvenile court erred by holding them in civil contempt of court. Specifically, they argue the court's contempt orders were defective because the court (1) failed to identify the specific order respondents allegedly violated, (2) failed to issue a proper purge provision, and (3) confused civil and criminal contempt proceedings. We agree with respondents' contentions and find the court erred.

¶ 35    Generally, civil contempt is designed to compel future compliance with a court order. *Felzak v. Hruby*, 226 Ill. 2d 382, 391, 876 N.E.2d 650, 657 (2007). Civil contempt differs from criminal contempt in that "[c]riminal contempt is retrospective in nature and consists of punishing for doing what has been prohibited or not doing what has been ordered," while "civil contempt is prospective in nature and is invoked to coerce what has been ordered." *People v. Budzynski*, 333 Ill. App. 3d 433, 438, 775 N.E.2d 275, 280 (2002).

¶ 36    "Civil contempt proceedings have two fundamental attributes: (1) The contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44, 558 N.E.2d 404, 416 (1990). "In other words, the contemnor must have an opportunity to purge himself of contempt by complying with the pertinent court order." *Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416.

¶ 37    "Contempt that occurs outside the presence of the court is classified as indirect contempt." *In re Marriage of Spent*, 342 Ill. App. 3d 643, 653, 796 N.E.2d 191, 200 (2003). "The existence of an order of the court and proof of willful disobedience of that order are essential to any finding of indirect contempt." *Spent*, 342 Ill. App. 3d at 653, 796 N.E.2d at 200. In the context of civil contempt, "[t]he burden rests upon the alleged contemnor to show that noncompliance was not willful and contumacious and that he or she has a valid excuse for failure to follow the court order." *Spent*, 342 Ill. App. 3d at 653, 796 N.E.2d at 200. "Whether a party is guilty of contempt is a question of fact for the trial court, and its ruling will not be disturbed unless it is against the manifest weight of the evidence or an abuse of discretion." *In re Marriage of Smithson*, 407 Ill. App. 3d 597, 607, 943 N.E.2d 1169, 1177 (2011).

¶ 38    On appeal, respondents contend the juvenile court improperly failed to identify the specific court order with which they failed to comply. We agree with respondents but find this issue is further complicated by the court's failure to state precisely what conduct by respondents it found contemptuous. Neither the court's comments at the hearing on the rule to show cause nor its contempt orders specified the conduct upon which its contempt finding was based. Further, in its rule to show cause, the court identified several actions or inactions by LSSI and DCFS as

problematic, including the failure to remove M.S. and P.S. from their foster placement after their grandfather's positive drug test, the failure to conduct a background check on the grandparents, and the failure to conduct a drug drop on the minors' new foster parents once they were removed from their grandparents' home. Nevertheless, despite the juvenile court's lack of specificity, we note that the hearing on the rule to show cause focused on the decision by LSSI and DCFS to allow M.S. and P.S. to remain in their foster placement following their grandfather's positive drug test. Additionally, it is that decision which both the State and respondents identify on appeal as being the basis for the court's contempt finding. Therefore, we accept that action as the offending conduct for which respondents were held in contempt.

¶ 39 As discussed, to hold respondents in indirect civil contempt, it was essential that the juvenile court find the existence of a court order–and in this case specifically, an order requiring the removal of M.S. and P.S. from their foster placement–as well as proof of willful disobedience of that order. Here, the court failed to identify a specific order upon which its contempt finding was based and the record fails to reflect the existence of either a written or oral court order requiring the minors' removal from their foster home.

¶ 40 First, at no point during the proceedings did the juvenile court identify a specific order violated by respondents. In its rule to show cause, the juvenile court stated it "had multiple meetings with DCFS and case agencies including [LSSI] since 2013" and had "made it very clear through direct orders that foster parents engaging in the use of illegal drugs would not be tolerated *** and that the wards should be moved if the foster parent has a drug issue." At the conclusion of the hearing on its rule to show cause, the court held respondents "in contempt of the Court orders entered in 2013 JA 104 and 105 [(the cases involving M.S. and P.S)], as identified in the petition in the rule, and in the memorandum of law and the Respondent's [*sic*] arguments, as well as Petitioner's today." However, the court's written contempt order did not identify any specific order that respondents violated.

¶ 41 Second, we find the record fails to reflect the existence of a written order–either specifically referencing M.S. and P.S. or more generally referencing any minor in DCFS's custody–which expressly required DCFS to remove M.S. and P.S. from their grandparents' home following their grandfather's positive drug test. At the hearing on the rule to show cause, many references were made to a "standing drug drop order" entered by the juvenile court and which affected foster parents. Respondents argue the standing order cannot provide a basis for the court's contempt finding as it did not require the removal of minors from a foster home upon a foster parent's positive drug test. On appeal, the State does not dispute this position; however, below, both the State and the juvenile court made statements indicating that a "common sense" implication of the standing order was for DCFS to remove a minor from the care of a foster parent with a positive drug test.

¶ 42 Although the standing order is not a part of the appellate record, respondents have included it within the appendix to their brief and ask that we take judicial notice of that order. The State asks that we disregard the standing order on the sole basis that it was not made a part of the record on appeal. In this instance, we find it appropriate to take judicial notice of the juvenile court's standing order. See *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 377, 943 N.E.2d 725, 729 (2010) (noting a court may take judicial notice of public documents); *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159, 355 N.E.2d 7, 9 (1976) (stating a court may take "judicial notice of public documents which are included in the records of other courts and administrative tribunals"). The standing

order was referenced numerous times throughout the underlying proceedings such that there can be no doubt that it exists. Further, the record indicates both the parties and the juvenile court viewed it as being applicable to the cases involving M.S. and P.S.

¶ 43    The order contained in the appendix to respondents' brief identifies no specific case number and indicates it applies to "all juvenile cases." *In re* All Juvenile Cases, No. 2014, Standing Foster Parent Drug Drop Order (Feb. 10, 2014) (Anderson, C. (Judge entering order)). Additionally, it provides as follows:

> "On December 6, 2013 in case number: 2013 JA 117-118, the foster parent that appeared in court was asked to do a drug drop after court and the results were positive for drugs; and the court being interested in the safety and welfare of the children that appear before the court:
>
> IT IS HEREBY ORDERED that [DCFS] as the fiduciary and the party ultimately responsible for the welfare and the best interest of its child wards, is responsible for providing a drug drop in every initial case, with instant read results, for the foster parent(s) within 24 hours of placement or by substantial compliance (*i.e.*, as soon as possible)." *Id.*

We agree with the parties on appeal that the standing order does not provide a basis for the juvenile court's contempt finding against respondents. The standing order required only that DCFS "provide a drug drop" to foster parents under specific circumstances. It did not direct any specific action to be taken following a positive test.

¶ 44    Third, contrary to the State's contentions on appeal, nothing in the record supports a finding that an oral court order directing the minors' removal from their foster home existed. We acknowledge that "[u]nder some circumstances, an individual may be held in indirect civil contempt of court for violation of an oral court order." *First Midwest Bank/Danville v. Hoagland*, 244 Ill. App. 3d 596, 605, 613 N.E.2d 277, 284 (1993). However, "a court must use extreme caution in holding a person in indirect civil contempt of court for the disobedience of an order of which there exists no record, and of which the alleged contemnor consistently denies knowledge." *Hoagland*, 244 Ill. App. 3d at 607, 613 N.E.2d at 285.

¶ 45    In this case, the juvenile court generally referenced "meetings" it had with DCFS and LSSI and "direct orders" it had entered. However, the record fails to reflect when those meetings occurred or what specific orders were entered. General comments by the juvenile court judge during unspecified meetings do not rise to the level of a court order upon which a charge of contempt may be based. Additionally, we find there must be evidence of an order which gave clear and express directions to the contemptuous party.

¶ 46    In *People v. Wilcox*, 5 Ill. 2d 222, 226-27, 125 N.E.2d 453, 455 (1955), the trial court held the plaintiff in error in criminal contempt, finding she filed two motions in a case after the court had instructed her that it could not entertain them and denied her leave to file the motions. Although the plaintiff in error acknowledged that the court stated it would not consider the motions, she denied that it ordered her not to file them. *Wilcox*, 5 Ill. 2d at 226, 125 N.E.2d at 454. The supreme court reversed, noting "no order was entered of record by the court" and finding there had also been "no showing in the record that an order was clearly given or understandingly received." *Wilcox*, 5 Ill. 2d at 229, 125 N.E.2d at 456. In so holding, the court noted the allegations in the case involved "contemptuous disobedience of an order of the court" and "the existence of an order of the court and proof of wilful disobedience" were essential elements to the charge. *Wilcox*, 5 Ill. 2d at 228, 125 N.E.2d at 456. The court stated

- 11 -

"that the mandate of the court must be clear before disobedience can subject a person to punishment." *Wilcox*, 5 Ill. 2d at 228, 125 N.E.2d at 456.

¶ 47    Here, the evidence presented at the hearing on the rule to show cause weighed in favor of finding no oral order existed which directed DCFS and LSSI to remove M.S. and P.S. from their foster home. No witness testimony at the hearing supported the existence of an oral order and Beard testified he was not aware of any statement by the juvenile court judge–either in court or during meetings–that minors should not remain in a foster placement if the foster parent tested positive for drugs. Beard further detailed his attempts to seek clarification of the issue from the court after the grandfather's positive test in the instant cases. Thus, although violation of an oral order of the court may form the basis for a finding of contempt, in this case, the record fails to reflect a clear order given which was understandingly received by either DCFS or LSSI personnel.

¶ 48    On appeal, the State argues *Wilcox* is distinguishable because the supreme court based its decision on "the drastic and precipitate nature of punishment for criminal contempt." *Wilcox*, 5 Ill. 2d at 230, 125 N.E.2d at 457. However, we do not find the court's decision so limited. As the court discussed, the matter before it involved contemptuous disobedience of a court order and, essential to those allegations, was the existence of a court order. Similar circumstances are presented here. Additionally, we note this court has also found that "[h]olding an individual in contempt of court is a drastic remedy" when addressing indirect civil contempt proceedings. *Hoagland*, 244 Ill. App. 3d at 605, 613 N.E.2d at 284.

¶ 49    For the reasons stated, we find the record fails to reflect the existence of a clear order upon which the juvenile court could base its contempt finding against respondents. Although this appeal may be resolved on that issue, we also find it significant that the court appears to have confused civil and criminal contempt proceedings. We reiterate that "[c]riminal contempt is retrospective in nature and consists of punishing for doing what has been prohibited or not doing what has been ordered" while "civil contempt is prospective in nature and is invoked to coerce what has been ordered." *Budzynski*, 333 Ill. App. 3d at 438, 775 N.E.2d at 280. Further, "the contemnor must have an opportunity to purge himself of contempt by complying with the pertinent court order." *Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416.

¶ 50    Here, the juvenile court clearly asserted it viewed the case as presenting a situation of civil contempt. However, even assuming a court order existed that required DCFS and LSSI to remove M.S. and P.S. from their foster placement, the record reflects that action was taken on May 23, 2014, prior to the date the court issued its rule to show cause and before it held respondents in civil contempt. Thus, by the time contempt proceedings began, there was no action for the court to coerce. Instead, it sought to punish respondents for not immediately doing what had been ordered.

¶ 51    In *Hoagland*, we held it was not appropriate to hold a defendant in indirect civil contempt for belatedly complying with a court order. We stated as follows:

    "Holding [the defendant] in contempt of court for failing to provide [the] plaintiff with copies of his tax returns within five days of filing did not have the effect of *coercing* [the defendant] to produce the tax returns, but rather to *punish* him for failing to produce the tax returns *within five days of filing*. Criminal sanctions are retrospective in nature; they seek to punish a contemnor for past acts which he cannot now undo. Civil sanctions are prospective in nature; they seek to coerce compliance at some point in the future. [Citation.] [The defendant] did not provide [the] plaintiff with copies of

- 12 -

his tax returns within five days of filing, but he did provide [the] plaintiff with copies of the tax returns *** prior to the contempt hearing. Thus, at the contempt hearing ***, the purpose of holding [the defendant] in contempt of court was apparently not to coerce him to comply at some point in the future, but to punish him for failing to provide [the] plaintiff with copies of the tax returns within five days of their filing." (Emphases in original.) *Hoagland*, 244 Ill. App. 3d at 611-12, 613 N.E.2d at 288.

¶ 52   Additionally, conflating indirect civil and criminal contempt is problematic because of the due process rights involved with each type of contempt proceeding. " 'In a civil contempt proceeding, the contemnor is only entitled to minimal due process, consisting of notice and an opportunity to be heard.' " *People v. Covington*, 395 Ill. App. 3d 996, 1007, 917 N.E.2d 618, 627 (2009) (quoting *In re Marriage of Cummings*, 222 Ill. App. 3d 943, 948, 584 N.E.2d 900, 903 (1991)). However, "[i]ndirect criminal contempt proceedings must generally conform to the same constitutionally mandated procedural requirements as other criminal proceedings." *Betts*, 200 Ill. App. 3d at 58, 558 N.E.2d at 425.

> "Because a respondent in an indirect criminal contempt proceeding enjoys the privilege against self-incrimination, he may not be called by the petitioner to testify. Accordingly, a petition initiating indirect criminal contempt proceedings ought not have the title 'Petition for Rule To Show Cause,' the designation commonly (and appropriately) used for a petition initiating an indirect *civil* contempt proceeding; instead, a petition initiating an indirect criminal contempt proceeding ought to have the title 'Petition for Adjudication of Criminal Contempt.' By definition, if a respondent has a right not to testify, he cannot be required to 'show cause' why he should not be held in indirect criminal contempt. Instead, the burden is on the petitioner to prove the charges in the petition beyond a reasonable doubt. An ancillary benefit of using such a title would be to force court and counsel into a recognition that such petitions differ from routine petitions for rules to show cause and require different procedural steps." (Emphasis in original.) *Betts*, 200 Ill. App. 3d at 58-59, 558 N.E.2d at 425.

¶ 53   Here, the juvenile court's contempt order had the effect of punishing respondents for actions which they could not undo–failing to immediately remove M.S. and P.S. from their placement after their grandfather's positive drug test. Respondents could not properly be held in indirect civil contempt based on such actions. Further, the due process requirements for indirect criminal contempt were not met.

¶ 54                                  III. CONCLUSION
¶ 55   For the reasons stated, we reverse the juvenile court's judgment.

¶ 56   Reversed.