NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240952-U

NO. 4-24-0952

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KAYLA T., n/k/a Kayla F., | ) | Adams County |
|     Petitioner-Appellee, | ) | No. 20D181 |
| | ) | |
|     and | ) | |
| | ) | Honorable |
| ZACHARY T., | ) | Holly J. Henze, |
|     Respondent-Appellant. | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's allocation of the majority
of parenting time to petitioner was not against the manifest weight of the evidence.

¶ 2    Respondent, Zachary T., appeals the trial court's judgment allocating the majority

of parenting time with Vin. T. (born April 2017) and Viv. T. (born October 2018) to petitioner,

Kayla T., n/k/a Kayla F. Zachary claims the determination it was in the children's best interest to

allocate the majority of parenting time to Kayla was against the manifest weight of the evidence.

For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Zachary and Kayla married on October 15, 2015, in Adams County, Illinois. The

marriage produced two children, Vin. T. and Viv. T. The family lived in the marital residence until

September 21, 2020, when Kayla filed for, and was granted, an emergency order of protection,

granting her exclusive possession of the residence and temporary custody of the children. On September 30, 2020, Kayla filed a petition for dissolution of marriage in which she requested, *inter alia*, the majority of parenting time with the children. On December 14, 2020, Zachary and Kayla entered into an agreed interim order permitting him parenting time, supervised by his mother, on Saturdays from 8 a.m. to 4 p.m.

¶ 5    A. Zachary's Petition for Temporary and Permanent Allocation of Parental

Responsibilities, Parenting Time and Child Support

¶ 6    On January 5, 2021, Zachary filed a "Petition for Temporary and Permanent Allocation of Parental Responsibilities, Parenting Time and Child Support." Zachary asserted, as pertinent to this appeal, that it was in the children's best interest for him to be granted the majority of parenting time because (1) he was a stay-at-home parent and the children's primary caretaker, (2) Kayla's work schedule prevented her from adequately providing for the children's well-being, (3) he was primarily responsible for transporting the children to medical appointments, and (4) he had "ample support from his parents" in terms of taking care of the children. On January 28, 2021, the trial court entered a judgment of dissolution of marriage reserving, *inter alia*, the allocation of parenting time.

¶ 7    B. The Guardian *Ad Litem*'s Initial Report

¶ 8    On February 1, 2021, attorney Drew Erwin was appointed guardian *ad litem* (GAL). On March 31, 2021, Erwin filed his initial report with the trial court.

¶ 9    Erwin explained Kayla was employed full-time as an architect. Initially, Zachary was unemployed due to injuries from multiple car accidents and taking care of the children during the days. However, Zachary had recently secured employment at Ascend Illinois, a marijuana growing facility. Erwin reported seeing photos of the marital residence, while Zachary was the

primary caretaker, showing "marijuana pipes and lighters laying in plain sight and within reach of the children." Erwin conveyed Kayla's primary concerns were Zachary's constant use of marijuana and his mental health issues. According to Kayla, Zachary smoked marijuana all day every day, suffered from depression, had been suicidal since they met, and spent upwards of $300 per week on marijuana. It was Kayla's opinion Zachary was not capable of taking care of the children for extended periods of time. Kayla believed Zachary's parenting time should be supervised until he dealt with his mental health issues and stopped smoking marijuana around the children. In light of Vin T.'s autism diagnosis, Kayla was concerned he would need a structured environment, something Zachary was not capable of providing. As for Zachary, Erwin explained he had been diagnosed with major depressive disorder and attention deficit/hyperactivity disorder (ADHD). Zachary takes various prescription drugs for pain associated with his auto accidents, depression, anxiety and ADHD. Zachary admitted to his daily use of marijuana, up to one gram daily, but claimed he did not smoke in front of the children and if he had smoked while the children were there, Kayla was in the house.

¶ 10          Erwin then addressed the pertinent factors set forth in section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.7 (West 2020)) regarding the allocation of parenting time and recommended Zachary be granted unsupervised parenting time from 6 p.m. Saturday to 6 p.m. Tuesday during even weeks of the year and 6 p.m. Sunday to 6 p.m. Tuesday during odd weeks of the year. Erwin recommended Zachary "be ordered not to consume or be under the influence of marijuana for 12 hours prior to exercising any parenting time and during scheduled parenting time" and "comply with and follow any treatment plans of mental health professionals providing care to him." On April 19, 2021, Zachary and Kayla entered an agreed temporary order permitting him the unsupervised parenting time Erwin recommended. The

- 3 -

trial court continued this arrangement with the order of July 8, 2021, dismissing the September 2020 emergency order of protection on Kayla's motion.

¶ 11                     C. The GAL's Supplemental Report

¶ 12        On January 18, 2023, Erwin filed his supplemental report. Erwin reported Zachary was "consistently late in dropping the children off at school or dropping them off for scheduled parenting time with [Kayla.]" Zachary was "consistently late by 30 minutes" and has even "been over an hour late" taking the children for parenting time with Kayla. Vin. T. was late to school 4 times and Viv. T. was late to school 10 times during the fall 2022 semester. Based on the parenting time arrangement, Zachary would have been responsible for all 4 of Vin. T.'s late arrivals and 7 of Viv. T.'s 10 late arrivals. Zachary reported Vin. T. "often takes more time than [Zachary] schedules to get to school and as a result [Viv. T.] is then late to school." Zachary thought "he has better adapted to their schedule and believe[d] he will do better in the future." Zachary acknowledged arriving late with the children for parenting time with Kayla, but he explained Vin. T. "will often times 'melt down' when it is time to leave, and he does not want to drop off the [children] when they are upset." Zachary expressed concern regarding the police being called "numerous times when the children are to be dropped off either at his home or [Kayla's] home" because they "get nervous when the police are present and have expressed concern to him about being afraid that he will go to jail." Zachary also reported being "upset that he is constantly being investigated" by the Illinois Department of Children and Family Services (DCFS), referring to three recent reports by Kayla, which were all unfounded.

¶ 13        Erwin believed Kayla "is attempting to alienate the children from [Zachary.]" Erwin continued, "It is my recommendation *** that the current parenting time schedule continue,

however, if [Kayla] continues to call the police for parenting time exchanges or encourages baseless DCFS investigations, then the Court should place restrictions on her parenting time."

¶ 14                    D. The Hearing on Zachary's Petition

¶ 15        The trial court conducted a hearing on Zachary's petition over six days between January 9, 2024, and February 9, 2024. What follows is a summary of the testimony pertinent to the issues raised in this appeal.

¶ 16                    1. *Marissa Lumpkin*

¶ 17        Marissa Lumpkin, a behavior analyst, provided "applied behavior analysis therapy services to individuals that have a diagnosis of autism spectrum disorder." Lumpkin had been treating Vin. T. at Blessing Outpatient Behavioral Health since 2020. Lumpkin was asked to describe Kayla's and Zachary's involvement with Vin. T.'s treatment. Regarding Kayla, Lumpkin testified she "has been very involved in [Vin. T.'s] therapy. She definitely is always inquisitive if a new maladaptive or problem behavior arises." Regarding Zachary, Lumpkin testified, that "In 2020 and in 2021, he would bring [Vin. T.] to therapy. There would be some times that I believe that conversations were had with him about [Vin. T.] and behaviors and things like that but since 2021, he has not had involvement." Kayla never told Lumpkin not to discuss Vin. T.'s treatment with Zachary. Moreover, in a seven-month period in 2021, there were eight occasions when Zachary was responsible for transporting Vin. T. on which he either was late to a session or missed a session. On some of the occasions when Vin. T. would miss a session, Zachary would not call ahead of time. Lumpkin also described an occasion in 2021 when Zachary arrived at a session with a "very strong odor" of marijuana.

¶ 18        While Kayla had "been involved from the beginning," Zachary had not reached out at all in the previous year to discuss Vin. T.'s treatment. Indeed, when Vin. T. began treatment

with Lumpkin, Zachary stated he did not believe Vin. T. even had autism. Lumpkin stated, however, that "If [Zachary] would like to be involved at any point in time, I welcome [him] to be involved in this and he could reach out and he could then also partake in [Vin. T.'s] treatment," since she "absolutely" believed it would be beneficial for Zachary to be involved.

¶ 19                                    2. *Catherine Case*

¶ 20        Catherine Case worked at the 10th Street Children's Academy when Vin. T. and Viv. T. attended preschool there. Case was asked to describe Kayla's and Zachary's involvement with the children's education. Regarding Kayla, Case testified she was an involved parent, was very communicative with teachers and staff, and attended parent-teacher conferences and extracurricular activities. Regarding Zachary, Case testified he was pleasant but was not seen as often as Kayla, nor did he participate in parent-teacher conferences. Communication with Zachary was a struggle, especially during emergencies or important situations. Case stated, "There were quite a few situations where we did not see the children and were not notified that they would not be coming into the center that day." She stated Zachary "should have been bringing [the children] at least twice a week. Unfortunately, more often than not on his days to drop off, we didn't see them." Case also recalled Zachary smelling of marijuana on approximately three to five occasions when he was picking up or dropping off the children.

¶ 21                                    3. *Cindy Awerkamp*

¶ 22        Cindy Awerkamp was employed with the Early Childhood and Family Center at Quincy Public Schools. Awerkamp was Viv. T.'s prekindergarten teacher for a year and a half prior to the hearing. Awerkamp was asked to describe Kayla's and Zachary's involvement with Viv. T.'s education. Regarding Kayla, Awerkamp testified she "has been there for every meeting. She texts back and forth with me. She has shown up for conferences, meet-the-teachers, and even

some random field trips." Kayla has "[a]bsolutely" and "[a] hundred percent" shown concern and interest regarding Viv. T.'s education. Regarding Zachary, Awerkamp testified, "I believe he came to the first meet-the-teacher which was our first contact at the beginning of last school year and he brings [Viv. T.] in usually Mondays and Tuesdays every week and I think he came to maybe a field trip last year." Zachary did not attend either of the other two "meet-the-teacher" events the previous school year, nor did he attend the one scheduled before the Thanksgiving break preceding the hearing. Kayla, however, attended all these events. Zachary was supposed to attend at least one other field trip, but "he either didn't show or showed up late or showed up and had to leave," resulting in Viv. T. "being upset." Teachers and parents can communicate through a program called Seesaw. Kayla had "[a]bsolutely" been communicating with Awerkamp, but Zachary had never sent any messages to Awerkamp, despite receiving the code to sign up for Seesaw.

¶ 23     Awerkamp then testified regarding Viv. T.'s tardiness to school. She stated there had "absolutely" been a problem with Viv. T. being tardy, particularly on Mondays and Tuesdays. She testified Zachary "brings [Viv. T.] in and more than likely on those days, she has been tardy." This has been "[c]onsistent for all of last year and the half of this year." In fact, Viv. T. arrived approximately an hour late the day before Awerkamp's testimony. Zachary brought Viv. T. inside, but he neither apologized for nor explained her tardiness. Viv. T. has occasionally missed breakfast at school because of her late arrivals. There have only been "a handful of times this year" where Zachary brought Viv. T. to school on time, "and there have also been numerous days that he was at least a half hour if not a little bit more tardy with her." Viv. T. had not been tardy on the days Kayla was responsible for her transportation.

¶ 24                                    4. *Amber Shaffer*

¶ 25          Amber Shaffer cared for Vin. T. and Viv. T. in her daycare facility from around September 2019 to November 2019. Zachary would "sometimes" bring the children to the daycare and pick them up. On occasions when Zachary picked the children up, Vin. T. would "hide under the dining room table" and make "like a rocking back and forth motion" if they were inside. This was "[n]ot always but pretty frequently." If everyone was outside, Vin. T. "wouldn't run to [Zachary] like he would to [Kayla.]" "Pretty much every time" Zachary picked the children up, he "smelled very strongly of marijuana," so much so that "it would linger when he would leave." This caused Shaffer concern for the children's safety.

¶ 26                                    5. *Samantha Landwehr*

¶ 27          Samantha Landwehr was Vin. T.'s first-grade teacher. Landwehr was asked to describe Kayla's and Zachary's involvement with Vin. T.'s education. Regarding Kayla, Landwehr explained she was great at communication. She was an involved parent and volunteered. As for Zachary, he was not as involved, did not attend any parent-teacher conferences, and rarely utilized the school's messaging system. Landwehr described Vin. T.'s school attendance. In particular, she stated, "Usually Mondays and Tuesdays are either late or absent." On the Mondays or Tuesdays when Vin. T. arrived late, Zachary would come into the classroom with him, which would "be very distracting to the students." The times at which Vin. T. arrived late ranged from "9:15 to sometimes 10:00."

¶ 28                                    6. *Julie Schulte-Brandon*

¶ 29          Julie Schulte-Brandon was Vin. T.'s kindergarten teacher. Vin. T. was occasionally tardy; when he was, it was "[m]ostly [on] Mondays and Tuesdays" and "anywhere from twenty minutes to an hour sometimes." Schulte-Brandon was asked to describe Kayla's and Zachary's

involvement with Vin. T.'s education. Regarding Kayla, Schulte-Brandon stated, "She would contact me, call me. She would Seesaw message me, tell me what was going on with [Vin. T.], [and] update me on some of his appointments for his behavior." Regarding Zachary, Schulte-Brandon "would talk to him every once in a while when he would drop off [Vin. T.]," but those conversations were mainly limited to exchanges like "hi, how are you doing."

¶ 30                                     7. *Jacqueline Hildebrand*

¶ 31           Jacqueline Hildebrand was an applied behavioral analyst for Atlas Behavior Services. Hildebrand treated Vin. T. from March 2, 2022, to December 16, 2022. Hildebrand was asked to describe Kayla's and Zachary's involvement with Vin. T.'s services. Regarding Kayla, Hildebrand testified, "She was the primary contact I had. She brought [Vin. T.] to all of his sessions and then she would stay for sessions as well." By contrast, Hildebrand testified she has "never met [Zachary] in person" and only "talk[ed] to him on the phone a couple of times." Zachary "said he wasn't sure that [Vin. T.] should be going to therapy or if he had autism." Zachary never followed up on Hildebrand's offer for him to be involved in Vin. T.'s therapy.

¶ 32                                     8. *Terry F.*

¶ 33           Kayla's grandfather, Terry F., testified regarding occasions in 2020 when Zachary would ask him to come over and assist with caring for the children. When Terry would go to Zachary's home, which he described as "a mess," he "would see him rolled up in his sleeping bag asleep on the couch" while the children were "just doing their own thing" and "playing or just running around." The children would run up to Terry in "wet diapers" and "wet pajamas."

¶ 34                                     9. *Kayla F.*

¶ 35           Kayla testified she would typically leave home for work at about 7 a.m. Kayla would have to "take off during lunch to go help take care of the children." Kayla was the one

"[p]rimarily" meeting the children's needs for clothing and food. Kayla was meeting the children's medical needs with only "[v]ery limited involvement" from Zachary. Zachary outright told Kayla he did not believe Vin. T.'s autism diagnosis and was "uncomfortable" with it, "as if it was almost a stigma." According to Kayla, Zachary "was very against me seeking any medical assistance for the [children.]" Kayla testified that sometimes when Zachary drops the children off, "they'll have bags of candy" or gum, even though "that is not allowed per their new dental work." Additionally, Kayla testified regarding bank statements that reflected Zachary frequently purchased fast food, whereas while they are at her home, the children "eat a lot of fresh fruits and vegetables."

¶ 36        According to Kayla, Zachary "quite frequently" does not bring the children home at the scheduled time (6 p.m.) but "[t]here's nothing [she] can do" about it. Kayla was asked about the calls she made to the police, as reflected in Erwin's report. Kayla explained the calls were made at the recommendation of her previous attorney. Some of the calls were simply to document late drop offs and Zachary smelling of marijuana, since he had been ordered to refrain from consuming 12 hours before he had the children.

¶ 37        Kayla was asked about the three DCFS reports Erwin mentioned in his report. Kayla stated she made only one of them and "was not aware" of the other two. Kayla explained she made this report after observing Vin. T. one day "suddenly put his face in [Zachary's] cro[t]ch and [Zachary] didn't do anything about it." On other occasions, and not having behaved in such ways before, Vin. T. tried to touch Kayla inappropriately and followed Viv. T. into the bathroom.

¶ 38        Kayla testified regarding an incident where Vin. T. swallowed a BB because, like "everything else," Zachary's BBs "were all over the place unless [she] was home to clean up." Kayla went on, "I cleaned when I got home and it would not be like that when I would leave so I would come home to a mess almost every day." Zachary would not help Kayla clean, since he

would leave almost as soon as Kayla returned. Kayla did not know where Zachary would go. Kayla testified she attempted to convince Zachary to stop smoking marijuana, but she "got so much backlash and other aggressive behavior that it was more just trying to keep the peace." Kayla stated Zachary attributed the children's tardiness to school to the fact that he had to take them to two different schools. Given that next year, the children would be attending the same school, the tardiness issue "should be resolved as long as they get to school on time."

¶ 39                                        10. *Drew Erwin*

¶ 40            Erwin, the children's GAL, felt it would not be in their best interest for Zachary to have an additional overnight with them. (Zachary, in his proposed parenting plan, requested an additional overnight on Tuesdays.) Erwin testified he did not feel the children were in harm's way while in Zachary's care. However, "[Erwin's] concern with [Zachary] is that he smokes up to a gram of marijuana a day," and Erwin did not think "that can be conducive to functioning as an organized, good parent at times." Erwin continued, "Absent marijuana, I don't have any concern about [Zachary] being around the children if he is sober." Erwin met with Zachary and the children "at least two to three times." During one of the meetings, Vin. T. asked Erwin "why does dad want to kill me or something to that effect." Erwin talked to Kayla, who denied saying this to Vin. T. Ultimately, Erwin was not able to "confirm those statements."

¶ 41                                        11. *Zachary T.*

¶ 42            Zachary "guess[ed]" he has been using marijuana for "[a] long time." Zachary had a medical card both in Colorado (where he and Kayla lived previously) and Illinois. Zachary testified he always smokes marijuana outside, "never" in his car or house. Kayla never told Zachary he had to stop smoking marijuana. Nevertheless, Zachary reportedly has "cut down drastically with the events of everything happening in court" and "would be willing to" stop

completely "if it is going to be that much of a problem with [him] smelling like it." During his testimony on the final day of the hearing, Zachary admitted smoking marijuana the night before, denied smoking in the morning that previous day, and said he "possibly" smoked in the afternoon.

¶ 43    Zachary "ha[s] not denied *** one bit" that the children have been late to school on the Mondays and Tuesdays when he would have them. According to Zachary, "the big issue" with getting the children to school on time was he could not drop off Viv. T. at school any earlier than 8:25 a.m. and only had 20 minutes to get from her school to Vin. T.'s. Nevertheless, the children would be attending the same school for the upcoming school year.

¶ 44    E. The Trial Court's Order

¶ 45    On February 26, 2024, the trial court entered a written order on Zachary's petition. The order provided it was in the children's best interest to maximize both stability and time with both parents. Due to Zachary's inability to timely deliver the children to school and appointments, the majority of parenting time was awarded to Kayla. The court noted the tardiness to school did not involve minimal tardiness and was more than occasional and Zachary had not corrected this issue, despite having over a year to do so. The order awarded Zachary parenting time during the school year on alternating weekends from after school on Friday to Sunday at 6 p.m., each Tuesday and Thursday from after school until 5 p.m. and each Wednesday until 8 p.m. During the summer months, Zachary was allocated parenting time on alternating weekends from 3 p.m. on Friday to 6 p.m. on Monday and from 3 p.m. each Wednesday to 6 p.m. on Thursday. The court required Zachary to "not consume any cannabis products 24 hours prior to and during his parenting time with the children and [to] keep all products and paraphernalia out of the children's sight," and to "have the children available and ready at the appointed time" for Kayla to pick them up, unless otherwise agreed to in writing. The court addressed Erwin's concern about potential parental

alienation on Kayla's part, noting her calls to law enforcement and DCFS were excessive. However, Kayla had corrected her negative behavior, and the constant reporting had ceased. Kayla demonstrated she has been able to coparent without the involvement of law enforcement or DCFS.

¶ 46     On March 25, 2024, Zachary filed a motion to reconsider. On May 16, 2024, the trial court denied Zachary's motion.

¶ 47     This appeal followed.

¶ 48                              II. ANALYSIS

¶ 49     On appeal, Zachary argues the trial court's determination that the allocation of the majority of parenting time to Kayla was in the children's best interest was against the manifest weight of the evidence. Zachary raises five arguments in support of this general proposition. Zachary contends (1) the children were "thriving" under the parenting time schedule set forth in the agreed order of April 19, 2021; (2) the evidence established the children's tardiness to school was "a temporary situation"; (3) the court disregarded Erwin's recommendations; (4) the court did not adequately consider Kayla's "campaign of harassment against Zachary and her longstanding, demonstrated desire to alienate him from the children and minimize his parenting time"; and (5) the court did not consider the factors set forth in section 602.7 of the Act (750 ILCS 5/602.7 (West 2022)).

¶ 50     Prior to addressing these arguments, we briefly address the timeliness of this disposition. This appeal is designated as "accelerated" pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018), as it involves the allocation of parenting time. Rule 311(a)(5) provides that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." *Id*. The original 150-day deadline in this matter was December 20, 2024. However, we granted Zachary's unopposed motion for extension of time to file the

record on appeal, which delayed briefing and our consideration of the appeal. As such, we find good cause to issue our decision outside the 150-day timeframe.

¶ 51 Section 602.7 of the Act (750 ILCS 5/602.7 (West 2022)) governs the trial court's determination of the allocation of parenting time and provides that trial courts must allocate parenting time according to the child's best interest. Though this statute outlines relevant considerations, "[a] determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25); see *In re Marriage of Spangler*, 124 Ill. App. 3d 1023, 1028 (1984) (stating the "strong and compelling" presumption in child custody cases). Witness credibility can play a large part in custody determinations. See *In re Marriage of Spent*, 342 Ill. App. 3d 643, 652 (2003). "Because the trial court is in a far better position to observe the temperaments and personalities of the parties and assess the credibility of the witnesses, the reviewing court affords great deference to the trial court's best interests findings." (Internal quotation marks omitted.) *Id.* We will not reverse a trial court's allocation of parenting time unless it goes against the manifest weight of the evidence. *Young*, 2018 IL App (4th) 170001, ¶ 56. "A [decision] is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.*

¶ 52 First, Zachary argues "the evidence elucidated at trial demonstrated that the children thrived" under the parenting time schedule provided in the April 2021 agreed order.

"Simply stated, there was no evidence adduced at trial that could possibly support the more than halving of Zachary's and the children's regular overnights together." Kayla disagrees, noting the children's consistent tardiness to school and appointments and Zachary's "chronic marijuana use." While this court is not tasked with reviewing a determination by the trial court that the children were not "thriving" under the temporary parenting time schedule—no such determination was made—there was ample evidence of Zachary's inability to consistently bring the children to school or appointments on time and his heavy use of marijuana for the court to have considered in fashioning its allocation of parenting time, contrary to Zachary's contention that "no evidence *** could possibly support" it.

¶ 53    Lumpkin, Case, Awerkamp, Landwehr, Schulte-Brandon, and Kayla all testified regarding the children's chronic tardiness to school or appointments due to Zachary's actions. Lumpkin testified there were eight occasions in a seven-month period in 2021 when Vin. T. was either late to a session or missed a session and that sometimes Zachary would not call ahead of time. Case testified there were "quite a few" instances when the children would be absent from preschool, "more often than not on [Zachary's] days to drop off," and Zachary did not notify the school they would not be attending on those days. Awerkamp testified Viv. T. was frequently tardy on Mondays and Tuesdays when Zachary was responsible for bringing her, even arriving approximately an hour late the day before Awerkamp's testimony, with no apology or explanation, and this problem was "[c]onsistent for all of last year and the half of this year." According to Awerkamp, there had only been "a handful of times this year" Zachary brought Viv. T. to school on time, and she would occasionally miss breakfast at school due to her tardiness. Landwehr testified Vin. T. was "[u]sually *** either late or absent" on Mondays and Tuesdays when Zachary would drop him off; when Vin. T. was late, he would arrive at about 9:15 a.m. or even as late as

10 a.m. Vin. T.'s attendance record for September 1, 2023, to January 5, 2024, was admitted into evidence and reflects 11 tardy arrivals on either a Monday or a Tuesday (and an unexcused absence on a Tuesday). Schulte-Brandon testified Vin. T. would arrive late "[m]ostly [on] Mondays and Tuesdays" and "anywhere from twenty minutes to an hour sometimes." And Kayla testified Zachary would "quite frequently" not bring the children home at the scheduled time and that "[t]here's nothing [she] can do" about it.

¶ 54 Lumpkin, Case, and Shaffer all testified regarding Zachary's marijuana use. Lumpkin described an occasion where Zachary arrived at one of Vin. T.'s sessions with a "very strong odor" of marijuana. Case recalled Zachary smelling of marijuana on approximately three to five occasions when he was picking up or dropping off the children at preschool. While the children were in Shaffer's home daycare in late 2019, Zachary "smelled very strongly" of marijuana "[p]retty much every time" he picked them up, so much so that "it would linger when he would leave," causing Shaffer to be concerned for their safety. Additional indications of the heaviness of Zachary's marijuana use came from Kayla, Erwin, and even Zachary. Kayla testified she attempted to convince Zachary to stop smoking marijuana, but experienced "backlash and other aggressive behavior" from him. Erwin stated Zachary was smoking up to a gram of marijuana a day, and this affected his ability to be "functioning as an organized, good parent at times." During his testimony on the final day of the hearing, Zachary admitted smoking marijuana the night before and to "possibly" having smoked in the afternoon that previous day. Zachary expressed his willingness to stop smoking marijuana completely, but only "if it [was] going to be that much of a problem with [him] smelling like it," and not due to the implications this habit was having regarding his ability to take care of the children or his relationship with Kayla.

¶ 55    The trial court allocated parenting time as it did, particularly by limiting overnights to Fridays and Saturdays during the school year, "[d]ue to Zachary's consistent inability to deliver the children to school (and other appointments) on time while they are in his care." In light of the evidence described above, including that of Zachary's chronic marijuana use, which undoubtedly was a significant causal factor in his inability to bring the children to school or appointments on time, Zachary's contention that "there was no evidence adduced at trial that could possibly support" the trial court's allocation of parenting time fails.

¶ 56    Second, Zachary argues the trial court's reduction of his overnight parenting time based on the children's tardiness to school was against the manifest weight of the evidence in that, "[a]s of the 2024/2025 school year, both children attend school within walking distance of [his] house," and "[t]he conflict between the children's school locations and start times is now no longer an issue." In response, Kayla contends Zachary's argument is "unavailing" in light of "the evidence at trial regarding [his] chronic tardiness over the past several years and through trial." We disagree. The fact that the children's chronic tardiness at school may no longer be an issue does not mean the trial court's allocation of parenting time based on evidence before it, during hearings in January and February 2024, of Zachary's *prior* inability to bring them to school on time is somehow against the manifest weight of the evidence. Should Zachary wish to have his parenting time modified based on the children's *present* punctuality to school and other activities, he is free to file the appropriate motion with the trial court. But this does not permit this court to conclude the trial court's determination was against the manifest weight of the evidence.

¶ 57    Third, Zachary argues the trial court erred in that it "appeared to reject, wholesale, [Erwin's] recommendation as to parenting time *** contrary to the manifest weight of the evidence." In response, Kayla contends "the trial court adopted most of [Erwin's]

recommendations and allocated Zachary a comparable amount of parenting time" to what Erwin recommended and "the trial court's allocation judgment repeatedly references [Erwin's] reports and testimony, thus evincing [its] reliance on [Erwin's] recommendations."

¶ 58        "A GAL acts under the control and direction of the [trial] court as the child's representative. A GAL is the 'eyes and ears' of the court." *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 415 (1994). A trial court is not bound by a GAL's recommendations. See *Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974). Nevertheless, the trial court should give "some weight" to those recommendations. *Wycoff*, 266 Ill. App. 3d at 416. In his initial report, Erwin recommended Zachary be granted unsupervised parenting time from 6 p.m. Saturday to 6 p.m. Tuesday during even weeks of the year and 6 p.m. Sunday to 6 p.m. Tuesday during odd weeks of the year. In his supplemental report, Erwin described the children's consistent tardiness to school and scheduled parenting time with Kayla on days Zachary was responsible for transporting them. The trial court, in the context of acknowledging Erwin's "recommendation concerning parenting time," ultimately granted Zachary parenting time "during the school year on alternating weekends from after school on Friday to Sunday at 6:00 pm, each Tuesday and Thursday from after school until 5:00 pm and each Wednesday until 8:00 pm." The court had before it, *inter alia*, Erwin's reports and testimony on which it based its determination that "[d]ue to Zachary's consistent inability to deliver the children to school (and other appointments) on time while they are in his care," it would not "fashion a parenting time schedule that allocates overnight parenting time on school nights to Zachary." Likewise, Erwin recommended Zachary not consume marijuana for 12 hours prior to parenting time or during parenting time, and the court ordered Zachary to abstain from marijuana 24 hours prior to parenting time and during parenting time. Thus, this court disagrees with

Zachary's contention that the trial court "reject[ed], wholesale, [Erwin's] recommendation as to parenting time."

¶ 59 Fourth, Zachary argues, "While the school tardiness issue was likely temporary *** , the issue of Kayla's harassing and alienating conduct was much more pervasive and could very well constitute an ongoing threat, both to the children's wellbeing and to a healthy relationship with their father." Relatedly, Zachary asserts the trial court "overlook[ed] Kayla's conduct." In response, Kayla asserts the court's order made " eminently clear that the matters Zachary now complains of were given significant consideration" and the fact "[t]hat he does not like the *** court's decision is not a basis for reversal."

¶ 60 As set forth above, the trial court *did* consider Kayla's prior purportedly "harassing and alienating conduct," though it made a factual determination about it contrary to Zachary's view. The court stated, "Kayla's calls to law enforcement and DCFS *** were without a doubt excessive" and her "constant reporting in an attempt to 'catch' and document Zachary doing something illegal or acting not in the best interests of the children certainly crossed the line and could be considered harassment." However, the court determined "Kayla has corrected these negative behaviors," noting she "has stepped back and the constant reporting has ceased." That the trial court came to a conclusion Zachary believes to be incorrect does not itself mean this court can find it "overlook[ed]" the pertinent evidence. See *In re S.M.*, 314 Ill. App. 3d 682, 687 (2000) ("The reviewing court does not reweigh the evidence or reassess the credibility of the witnesses."). We therefore disagree with Zachary as to this issue.

¶ 61 Finally, Zachary argues the trial court "did not even touch on most, if not all" the factors set forth in section 602.7 of the Act (750 ILCS 5/602.7 (West 2022)) in its order allocating parenting time. According to Zachary, "[t]he absence of any acknowledgment or analysis of the

- 19 -

Section 602.7 factors in the court's order[ ] is evidence of its failure to consider them." In response, Kayla contends the court's order "clearly evinces consideration of the statutory best-interest factors." We note, as Kayla points out, the April 2021 agreed order by its express terms only temporarily allocated parenting time. Thus, through assessing Zachary's petition, the trial court was tasked with establishing an original allocation of parenting time pursuant to section 602.7 and not a modification of a permanent allocation pursuant to section 610.5. See *id.* § 610.5.

¶ 62        In allocating parenting time, the trial court must apply the relevant standards from the Act. See 750 ILCS 46/802(a) (West 2022). Parenting time is allocated according to the child's best interest. 750 ILCS 5/602.7(a) (West 2022). The court must consider all relevant factors, including the following statutory factors:

> "(1) the wishes of each parent seeking parenting time;
>
> (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;
>
> (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;
>
> (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;
>
> (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parents and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant."

*Id.* § 602.7(b).

Importantly, "[t]he trial court is not required to make specific findings regarding each section 602 factor as long as evidence was presented from which the court could consider the factors prior to making its decision." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79 (1996). Accord *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 ("Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor.").

¶ 63        Here, the trial court did not identify any particular statutory factor in its order allocating parenting time. The court did, however, state that the evidence adduced had "been applied to the statutory factors." See *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107-08 (1991) (concluding "the trial court considered the factors enumerated in section 602" when it stated it "reviewed the statute, the various sections of the *** Act relating to considerations the court is to consider with reference to the granting of custody," and "criteria for the best interests of the child" (internal quotation marks omitted)). Moreover, its evidence-based findings implicitly correlated with some statutory factors. As discussed above, the court allocated parenting time as it did, in particular by not permitting Zachary to have overnights with the children on school nights, due primarily to their chronic tardiness to school and appointments on his watch and his chronic use of marijuana. The evidence adduced was such as to permit the court to have considered particular factors prior to rendering its decision. *Hefer*, 282 Ill. App. 3d at 79. Specifically, this

court concludes the aforementioned evidence on which the court based its parenting time allocation decision bears upon at least the following statutory factors: (b)(4) ("any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child"); (b)(6) ("the child's adjustment to his or her home, school, and community"); (b)(7) ("the mental and physical health of all individuals involved"); (b)(8) ("the child's needs"); (b)(9) ("the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement"); (b)(10) ("whether a restriction on parenting time is appropriate"); and (b)(12) ("the willingness and ability of each parent to place the needs of the child ahead of his or her own needs"). 750 ILCS 5/602.7(b)(4), (6), (7), (8), (9), (10), (12) (West 2022)

¶ 64          We find Zachary's argument the trial court failed to consider any of the pertinent statutory factors unavailing. A careful reading of the court's decision and the relevant statutory factors indicate the court did consider and then apply the relevant law to the facts of this case. The fact that the court did not explicitly mention the factors "is insufficient to overcome the presumption that the trial court knew and followed the law." *G.L.*, 2017 IL App (1st) 163171, ¶ 44. Likewise, we find unavailing Zachary's argument that this court should reverse the trial court's parenting time allocation order "with directions for the court to consider all evidence and statutory factors" bearing on this issue like the Fifth District did in *Sadler v. Pulliam*, 2022 IL App (5th) 220213. *Sadler*, as Kayla points out, is distinguishable. In *Sadler*, not only did the trial court not mention the statutory factors in connection with a parenting time allocation decision, but it also did not provide a summary of the pertinent evidence. *Id.* ¶ 44. In addition, there were "no findings by a GAL that [the appellate court] could reference to determine what factors the [trial] court specifically relied on." *Id.* The trial judge merely said, " 'based upon all that I've heard, I do believe

it is in the best interest of the child to have a meaningful relationship with both parents.' " *Id.* By contrast, here, while the trial court did not enumerate any particular statutory factors in its written decision, it presided over a six-day hearing at which the allocation of parenting time was a significant issue and summarized the large body of evidence relevant thereto, including Erwin's two reports, in its written decision. We therefore decline Zachary's invitation to reverse the parenting time decision and remand the matter for a new hearing.

¶ 65 We reiterate that " '[i]n child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young*, 2018 IL App (4th) 170001, ¶ 64 (quoting *Agers*, 2013 IL App (5th) 120375, ¶ 25). Further, " '[i]t is no small burden to show that a [trial] court's ruling *** is against the manifest weight of the evidence.' " *In re Marriage of Jessica F.*, 2024 IL App (4th) 231264, ¶ 48 (quoting *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 50). Zachary has not met that burden here. We conclude the trial court's parenting time allocation decision is not against the manifest weight of the evidence as its findings and conclusions are not unreasonable, arbitrary, or unconnected to the evidence adduced, nor is the opposite conclusion apparent.

¶ 66                                  III. CONCLUSION

¶ 67 For the reasons stated, we affirm the trial court's judgment.

¶ 68 Affirmed.